[S. F. No. 6361.    Department Two.—July 6, 1914.]

## A. S. MACDONALD, Plaintiff and Appellant, v. JAMES L. DE FREMERY et al., Defendants; GEORGE ROETH et al., Defendants and Respondents.

BANKS AND BANKING—FRAUD INDUCING PURCHASE OF STOCK—ACTION FOR DECEIT.—It is sufficient, in order to sustain an action of deceit for false representations inducing the purchase of stock of a national bank, that the false statement was one, although it may not have been the sole, inducement for the purchase.

ID.—FRAUD—EXPRESSION OF OPINION.—An expression of an opinion, to avoid such action for deceit, must be the expression of an opinion honestly entertained by the person making it.

ID.—REPORT OF NATIONAL BANK—TRUTH AS TO CONDITION OF INSTITUTION.—The provision of the National Bank Act which requires the directors of a national bank to report its condition to the controller of the currency requires the report to contain a true statement of the condition of the bank, not a statement as shown by its books; and if the directors signing the report know that it contains statements of assets of less than their face value, which materially affect the value of the bank stock, they are individually liable to a purchaser of the stock who relies in good faith upon the report as stating the bank's true condition.

ID.—PURPOSE OF PUBLISHING REPORT—INDUCING PURCHASE OF STOCK.— It matters not whether such report was put forth for the express purpose of inducing any particular individual to purchase.

ID.—INTENTION OF DIRECTORS—BELIEF OF SOLVENCY OF BANK.—And it is immaterial that the directors of the bank believed that the bank would eventually come through its difficulties, or that the directors did not intend to cheat the purchaser of the stock.

ID.—RELIANCE ON REPORT—PURCHASER OF STOCK MAY PLACE.—The purchaser of the stock was justified in relying upon the directors' representations, either actual or as contained in the report, without further independent investigation of his own.

ID.—FALSE REPORT OF NATIONAL BANK—ACTION FOR DECEIT—INSUFFICIENT FINDINGS—REVERSAL OF JUDGMENT.—In this action for damages for deceit alleged to have been practiced upon the plaintiff by the directors of a national bank in inducing him to purchase stock of the bank at an over-valuation, by reason of false representations made as to the true financial condition of the institution appearing in the published official report of the bank, the judgment for the defendants must be reversed because of the incomplete, evasive, and contradictory nature of some of the material findings, and the absence of others.

APPEAL from a judgment of the Superior Court of Alameda County. William H. Waste, Judge.

The facts are stated in the opinion of the court.

Pillsbury, Madison & Sutro, for Appellant.

Fitzgerald, Abbott & Beardsley, and Williamson & Dibblee, for Respondents.

HENSHAW, J.—This action was brought to recover damages for deceit. The complaint charged that plaintiff was induced through the false representations of defendants to purchase stock of the Union National Bank of Oakland at a gross over-valuation, whereby plaintiff sustained damages in the sum of thirty-seven thousand four hundred dollars, alleged to be the difference between the price paid for the stock and its actual value at the times of purchase. The defendants were respectively president, first vice-president, and second vice-president of the Union National Bank. Defendant de Fremery died before the trial of the action, which as to him consequently abated and was dismissed. Upon the trial had against the remaining defendants the court made findings and gave judgment in favor of them. The plaintiff prosecutes this appeal under section 953a et seq., of the Code of Civil Procedure, contending that the findings and decision are not supported by the evidence.

The complaint charges upon three causes of action. In the first plaintiff seeks to recover damages in the sum of ten thousand four hundred dollars, the amount paid for fifty-four shares of stock bought from defendants, and fifty shares of a new issue of stock, for all of which stock plaintiff paid the par value of one hundred dollars per share. The second cause of action seeks damages in the same amount, growing out of the purchase of the same stock, but is founded on certain other allegations of fact and of fraudulent representations, which will hereinafter be set forth. In the third cause of action the allegations of the second are repeated, and it is charged that in reliance upon the alleged facts and the asserted fraudulent representations plaintiff purchased from a third person, one Perine, two hundred and seventy shares of the stock, paying therefor the par value.

For the better understanding of the controversy a brief historical presentment of certain unquestioned facts becomes necessary. The Union National Bank of Oakland had been in existence for many years. In 1907 its stock had sold for two hundred and forty-three dollars per share. Defendants had purchased small amounts of this stock at that price. It became too closely affiliated in its banking business with the California Safe Deposit and Trust Company of San Francisco, which latter institution closed its doors and went into insolvency. The Oakland bank then took advantage of the so-called "panic holidays" of the autumn of 1907 and suspended business, not as an insolvent institution, but under the protection of the Holiday Act. A committee of ways and means was appointed from the directorate of the bank to investigate its financial condition and formulate a plan for the resumption of business. The three defendants in this action, with three others, constituted this committee. It employed Mr. Kinght, an expert accountant, to make a complete examination of the assets of the bank and to report the result of this examination to the committee. Mr. Knight made this examination, placing specific valuations upon the bank's notes, bonds, and other securities. In so doing he consulted with de Fremery, Roeth, and other members of the board. The result of his examination, after such consultations, was embodied in a report in which these various securities were classified under the designations of "Good," "Not Valued," "Doubtful" and "Bad." By "Good" it was meant that the securities so classified were worth their face; by "Not Valued" that they were worth one-half of their face; by "Doubtful" that they were worth one-third of their face, and by "Bad" that they were valueless. Mr. Knight's report was carefully examined and passed upon by this committee of ways and means and expressed the opinion of the committee as to the value of the assets. This report was completed and presented on November 26, 1907. The bank then effected an agreement with its depositors touching the amounts and times of the withdrawal of their deposits and opened its doors for business on January 2, 1908. The three defendants became actively interested in the management of the bank. Mr. de Fremery was elected president, with a salary of five hundred dollars per month; Mr. Gray first vice-president, with a salary of two hundred dollars per month, and Mr. Roeth second vice-president with

a salary of three hundred dollars per month, positions which they retained up to and including the times of their transactions with plaintiff. A plan was proposed and accepted by the stockholders of the bank to bring in new capital by increasing the capital stock from one hundred and fifty thousand dollars to three hundred thousand dollars, selling one thousand five hundred shares of the new issue at par. On January 24th the three defendant officers and directors, together with three other directors, passed a resolution at the directors' meeting, awarding these three defendants each five thousand dollars in consideration of their services in selling the new issue, and conditioned upon their success in so doing. The bank did not prosper. Depositors withdrew their moneys, necessitating the sale of the bank's securities and the calling in of its loans to meet their demands. Thus over four hundred thousand dollars of loans were called in, and salable securities to the extent of one hundred and forty-five thousand dollars were disposed of. No new loans were made. Hence the bank was not engaged in that essential part of a lucrative business, but was in fact in liquidation, meeting its creditors' demands. In so doing its operating expenses exceeded its income, and such business as it was transacting was conducted at a loss of over one thousand six hundred dollars a month. In April, 1908, defendant Roeth, by his own testimony, gave up his salary of three hundred dollars per month, "so that the bank might live. I did not want to see the bank fail if I could help it." During this time defendant Gray, first vice-president, took an active interest in the bank's collections. He used a classified list of the notes of the bank and upon this list made his own notations touching their value. He classified the notes as "N. G." (meaning no good), "Good," "Bad," "Doubtful" and "Slow." Upon this list the bad loans of the bank aggregated over two hundred and twenty-six thousand dollars; the doubtful loans over one hundred and forty-six thousand dollars, or a total of over three hundred and seventy-three thousand dollars, while the "N. G." or worthless notes had an aggregate face value of over twenty-nine thousand dollars.

Such was the condition of affairs and such was the knowledge of the defendants of this condition of affairs when, on May 22, 1908, there was published in the Oakland *Tribune* in the city of Oakland, the following report, entitled: "Re-

port of the Condition of the Union National Bank of Oakland at the close of business May 14, 1908'': This was an official report to the controller of the currency as required by the National Bank Act.   It set forth:

"Resources:

| | |
|---|---|
| Loans and Discounts | $675,587.45 |
| Bonds, securities, etc. | 303,346.67 |

Capital Stock:

| | |
|---|---|
| Capital stock paid in | 150,000.00 |
| Surplus Fund | 100,000.00 |
| Undivided Profits | 51,052.01 |

Correct—Attest:

Geo. Roeth

George D. Gray

James L. de Fremery

Directors.''

In this report the item ''Loans and Discounts'' $675,587.45 included at their full face value, first, every one of the ''Doubtful'' loans of the Knight report, which loans had been set down as worth only one-third of their face, aggregating $107,155.59; second, every one of the ''Not valued'' loans set forth in the Knight report and valued at one-half of their face, aggregating $194,756.05; third, every one of the ''Bad'' and ''Doubtful'' loans specified in Gray's list, which aggregated $373,684.74; and, fourth, every one of the ''N. G.'' and ''Bad'' loans of Gray's list, aggregating $29,581.42, believed by Gray to be worthless.   All of these notes and loans were included among the resources of the bank as being worth their full face value.   Under the item ''Bonds, securities, etc., $303,346.67,'' were bonds of the face value of one hundred thousand dollars, which in the Knight report, approved by the committee, were held to be worth only fifty thousand dollars.   Accepting the Knight report as containing a fair estimate of the value of the bank's assets, and comparing it with the published statement of May 22d, above quoted, it is apparent that the value of the capital stock paid in, there represented to be one hundred and fifty thousand dollars, and the amount of the surplus fund, there represented to be one hundred thousand dollars, and the amount of the undivided profits, there represented to be $51,052.01, or a total of $301,052.01, were actually worth $55,310.90.   And from this valuation so fixed in November must be deducted the ad-

mitted losses which the bank had sustained since its reopening in January. And that the Knight report erred rather upon the side of liberality than conservatism is established by the facts that in May, 1909, a receiver took charge of the bank as an insolvent institution under the National Bank Act. And although between the date of this report and the failure of the bank one hundred and fifty thousand dollars had been added in cash capital, and although during all of that time no new loans had been made, the assets proved insufficient, after two years of liquidation, to pay off the depositors, to whom sixty thousand dollars are still owing. It is unnecessary to add that the stockholders have received nothing. Mr. Morris, the receiver of the bank, testified that many of the notes which were valued at one-half and one-third of their face in the Knight report, were still in his hands uncollected and uncollectible.

The full amount of the subscription to the one hundred and fifty thousand dollars new issue of the bank stock had not been secured by the defendants. A number of subscriptions were conditional upon full subscriptions being obtained by or before July 15, 1908. The defendants were not only in managerial charge of the affairs of the institution, but had undertaken to secure these subscriptions, and had voted themselves a five thousand dollar commission each for so doing. On July 9th, plaintiff, who was not a stockholder of the bank, and who had not been interested in the affairs of the bank, was approached by the president on the sidewalk in front of the bank, with the request for a business conversation, in the hope of interesting him in the institution. They withdrew to the president's office, where a conversation was had. There plaintiff met Mr. Roeth, the president stating that he was endeavoring to induce Mr. Macdonald to purchase some of their stock and Mr. Roeth replying that he hoped Mr. Macdonald would become interested. The published report of May 22d was handed to Mr. Macdonald the court finding that "at said time and place defendant Roeth said to plaintiff that said report correctly set forth the financial condition of said bank as shown by the books of the bank." Plaintiff, at the close of the interview, declared that he did not think that he was sufficiently interested to proceed in the matter and left the bank, but, at the solicitation of the president, agreed to return the following morning. Mr. de Fremery conferred with de-

fendant Gray after plaintiff's departure, told him he was trying to induce appellant to take some of the stock, and Gray expressed his approval. Plaintiff returned to the second conference upon the morning of July 10th, with the result that he agreed to buy fifty-four shares of the old issue of stock from the defendants and did so, paying them one hundred dollars per share, they having previously bought the stock during the period of the bank's suspension for fifty dollars per share. He also purchased fifty shares of the new issue. Plaintiff not only purchased this stock, but further undertook to aid in the rehabilitation and upbuilding of the bank. Before the purchase of the one hundred and four shares was actually consummated ten shares of the stock were placed in plaintiff's name to qualify him for admission to the directorate, to which he was immediately elected. On the following day, July 11th, he wrote to his friend Mr. Metcalf a letter, urging the latter to join with himself and his associates in the reorganization of the bank. The opening paragraphs of that letter are as follows:

"My Dear Metcalf:

"With a number of strong men as Directors, we are reorganizing the Union National Bank, and I have suggested your name for President, or Vice-President, whichever position you would entertain.

"Inclosed is the last statement. The Capital Stock, fully subscribed for, has been increased $150,000, giving $300,000 capital, with $100,000 surplus and $51,000 undivided profits.''

The letter proceeded to say that the writer could secure for Metcalf some of the stock at one hundred dollars per share if he desired to purchase it, and that "it would unquestionably be a very profitable venture for you." On July 17th plaintiff completed the purchase of the one hundred and four shares. A few days thereafter one Perine, whose brother was employed in the bank, offered to sell plaintiff two hundred and seventy shares of the stock at par. Plaintiff entered into an agreement for this purchase on July 31st. This sale was consummated on August 15th, when the stock was paid for by plaintiff. The day following this last purchase plaintiff testified that he was confidentially informed by the cashier of the falsity of the representations which had been made to him and of the true condition of the institution. He immediately proceeded to make an investigation, and finding the

cashier's information to be true, tendered to defendants the stock which he had purchased, demanding a return of the money and other properties paid therefor. The defendants refused to acknowledge the justice of his demand, and this action followed.

The gravamen of the charges of fraud and deceit in the second and third causes of action are the same. Plaintiff charged the official and managerial capacity of the defendants; that they were familiar with and knew the financial condition of the bank; were familiar with the values of all of the assets and liabilities of the bank; that they requested plaintiff to purchase a hundred shares of the capital stock of the bank and delivered a copy of the report of the condition of the bank at the close of business on May 14, 1908, to plaintiff, at the same time telling him that that report was correct and was a true statement of the financial condition of the bank. He pleaded further that the report was attested as being correct by each of the respondents, and was made, issued, and published as required by the National Bank Act; that he believed and relied upon the report and was thereby induced to buy the stock; that if the report had been correct the stock would have been worth at least the price paid for it. But "that at all of said times and at all times herein mentioned said report was false and untrue in the following particulars, to wit: The loans and discounts of said bank which were stated in said report to be of the value of $675,587.45 were of no greater value than $375,000; the bonds, securities, etc., which were stated in said report to be of the value of $303,346.67 were of no greater value than $200,000." Further plaintiff alleged that the defendants and each of them knew the report to be false and untrue in the particulars stated, and that the stock of the bank was at all times without value, and that in consequence of these fraudulent representations plaintiff sustained the damage for which he sought recovery. The third cause of action charges upon the same report and representations and alleged that in reliance upon them he purchased the two hundred and seventy shares of stock from Perine. Each defendant filed a separate answer, and to the allegations concerning the report they pleaded as follows:

"This defendant denies that at all or any of said times or at any time said report was false or untrue in the particulars

mentioned in paragraph III of said second cause of action or
in any particular, and further denies that the loans and dis-
counts of said bank were of no greater value than three hun-
dred and seventy-five thousand dollars ($375,000), and further
denies that the bonds, securities, etc., of said bank were of
no greater value than two hundred thousand dollars ($200,-
000), and in connection with said denials, said defendant al-
leges that the statements of the value of the loans and
discounts of said bank, and of the bonds, securities, etc., of
said bank, and the statements of value as to all the assets
and liabilities of said bank contained in said report were
and each of them was an expression of opinion as to the value
of said assets and said liabilities, and that said statements
and none of them were statements of facts, and that said
defendants and each of them believed at the time said report
was made, that said report represented the true condition and
affairs of said bank, and that said report represented the true
value of the assets and liabilities of said bank, and that said
report represented the opinions of defendants and each of
them as to the value of the bank's assets and liabilities and
each item thereof.''

The court found that the defendants were such officers of
the bank, and ''actively participated in the business of the
bank and constituted the managing officers of the bank,'' and
each of the defendants was familiar with and knew the finan-
cial condition of the bank, but no one of the defendants, nor
all of them, ''knew the value of all of the assets and liabilities
of said bank.''  ''Plaintiff knew that the defendants had been
and were such managing officers and directors of the bank''
and ''that they and each of them were and was at all such
times familiar with the financial condition of said bank; and
that it is a fact that at said times plaintiff believed that said
defendants and said James L. de Fremery were familiar with
the value of all the assets and liabilities of said bank.''  The
court further found it to be a fact that defendants requested
plaintiff to purchase the stock of the bank.  It found that
defendants did deliver a copy of the official report of May
22d to defendant on the ninth day of July, but found that
none of the defendants ''then or there or at all told plaintiff
that said report was correct, or that said report was a true
statement of the financial condition of said the Union National
Bank; but that it is a fact that at said time and place defend-

ant Roeth stated to plaintiff that said report correctly set forth the financial condition of said bank *as shown by the books of said bank.* Touching the specific allegations of the falsity of the report as averred in the complaint, it found: "That it is not a fact that at all or any of said times, or at all, or any of the times herein, or in said amended complaint mentioned, said report was false or untrue in that the loans and discounts of said bank which were stated in said report to be of the value of $675,587.45, were of no greater value than $375,000, and that it is not a fact that at said time or place said report was false, or untrue in that the bonds, securities, etc., which were stated in said report to be of the value of $303,346.67, were of no greater value than $200,000." Additionally, the court found: "That it is a fact that plaintiff believed or relied on said report, but that it is not a fact that by reason of plaintiff's reliance on said report plaintiff purchased or subscribed for any shares of stock of said bank." Finally the court found that at the time of the first purchase of stock and at the time of the second purchase of stock it was "not a fact that plaintiff had no knowledge of the financial condition of said bank or of the truth or falsity of said alleged statements or said alleged representations; and that it is not a fact that plaintiff believed or relied upon said alleged statements or said alleged representations; that it is not a fact that on or about the thirty-first day of August, 1908, plaintiff ascertained the true condition of said bank, but that it is a fact that sometime in the month of July, 1908, plaintiff ascertained the true condition of said bank; that it is a fact that plaintiff was familiar with the condition and the affairs of said bank and knew the condition thereof at the time of the purchase of said stock of said bank as hereinbefore mentioned."

From the discussion which follows will be eliminated any consideration of other false representations alleged to have been made by defendants to plaintiff, as that the bank was in a sound financial condition, that it was making money, that its stock was of the value of one hundred and forty-five dollars a share, as would have been the case had the official report of May 22d been true. Upon all these matters there is, as is usual, a sharp conflict in the evidence, and the findings of the court may not here be disturbed. We will limit the consideration under the findings actually made, to the question whether

or not these findings are supported by the evidence, and to the final question whether, if so supported, they sustain the judgment. This task would be much simpler were it not for the evasive and inconclusive nature of the findings which the court actually made. Thus, the complaint charged that the official report, admittedly attested and published by the defendants as representing the condition of the bank (which, as we shall hereafter see, means the *true* condition and not a mere transcript from the books) was false in specified particulars. The answer tendered issue by a denial to the effect that it was not true, as stated in the complaint, that the loans and discounts were of no greater value than three hundred and seventy-five thousand dollars, and that the bonds and securities of the bank were of no greater value than two hundred thousand dollars as pleaded in the complaint. The answer does not attempt to say that the loans and discounts and the bonds and securities were of the actual value placed upon them in the official report. Manifestly, a pleader in such a verified answer would escape all consequences attaching to false denials by evidence that the loans and discounts, instead of being worth three hundred and seventy-five thousand dollars, were worth three hundred and seventy-six thousand dollars, and that the bonds and securities were worth two hundred and one thousand dollars, instead of two hundred thousand dollars. But such a denial, with proof to establish it, would not at all meet and avoid the allegations of the complaint that the report was materially false in these essential particulars. What the defendants rested upon in their answer in avoidance of the complaint is made clear by the last portion of the paragraph above quoted. They rested, and pleaded that they rested, upon the proposition that the statements in the official report were not statements of fact at all, but statements of opinion, and that the report "represented the opinions of defendants and each of them as to the value of the bank's assets and liabilities and each item thereof." But an expression of an opinion, to avoid an action for deceit, must be the expression of an opinion honestly entertained by the person making it. (*Barron Estate Co. v. Woodruff Co.*, 163 Cal. 561, [42 L. R. A. (N. S.) 125, 126 Pac. 351]; *Phelps* v. *Grady*, *ante* p. 73, [141 Pac. 926].)

Confronted by the Knight report, wherein it is shown that the opinion of these defendants as to the value of the bank's

assets was radically different from and showed a valuation materially less than the opinion expressed in their official report, the conclusion that the report contained a false and dishonest expression of opinion, unless a reasonable explanation be presented, is well nigh inevitable. But the court does not find upon this, but, to the contrary, shifts its ground and declares that the defendants in giving the report to plaintiff, declared only that it "correctly set forth the financial condition of said bank as shown by the books of said bank." But this was not the defendants' plea at all. Moreover, when the court comes to find upon the question of the falsity of the published official report, it fails utterly to find, as it should, what was the difference between the published value of the loans and discounts and bonds and securities and the real value, but limits its findings to the evasive declaration that this report was not false or untrue, in that the loans of the bank stated in the report to be of the value of $675,587.45, were of no greater value than three hundred and seventy-five thousand dollars. It nowhere declares what the true value was, nor what was the discrepancy between the published value and the actual value. Yet, manifestly, such a finding is essential to the disposition of the case, since, if plaintiff had the right to rely upon this published report, it is of the highest importance in determining the rights and equities of the parties to know how great is the variance between the official statement and the facts as known to or believed by the officials themselves when that statement was promulgated. The evidence to support such a finding was before the court in the Knight report. It was evidence of singular persuasiveness, in that it was evidence of the values fixed by the accountant employed by these defendants, which values were by the accountant himself arrived at after consultation with the defendants, and which values were carefully considered and approved by the defendants. In the same way the court limits its findings to a declaration that it is not true that the stock purchased by plaintiff was "without any value whatever." What was the actual value was easily susceptible of determination, and the evidence of the Knight report was before the court from which it could have determined it. Plaintiff paid one hundred dollars a share for his stock. If he was defrauded into making the purchase and the stock, though not valueless, was worth but ten, fifteen, or

twenty dollars a share, it was for the court so to have found. Again, it is to be noticed that the court fails utterly to find whether or not the report was or was not false in any essential particular precisely as it fails to find upon the good faith of the defendants which they pleaded, to the effect that whether correct or incorrect, the report was but the expression of their honest opinions upon questions of values. Still further, the court finds it to be a fact that plaintiff *relied* on this report, but also finds that it is not a fact that by reason of his reliance on the report plaintiff purchased or subscribed for any shares of stock. It is difficult to comprehend this finding. Plaintiff was handed a report of the financial condition of the bank as contained in its last official published report. By that report the book value of the stock was approximately one hundred and forty-five dollars a share. The court finds that he relied on that report, which can only mean that he relied upon it in making his stock purchases. But at the same time the court finds that it is not a fact that he purchased because of his reliance on the report. The two statements are absolutely at war with each other and are self-destroying, saving upon the one theory that the court meant that plaintiff did not purchase in *sole* reliance upon the report. But this, if it be true, is not destructive of plaintiff's right of action. "It is sufficient, in order to maintain the action, that the false statement was one, although it may not have been the sole, inducement for the purchase." (*Morgan v. Skiddy,* 62 N. Y. 319; *Hindman* v. *First Nat. Bank,* 112 Fed. 931, [57 L. R. A. 108, 50 C. C. A. 623] ; *Sioux Nat. Bank v. Norfork State Bank,* 56 Fed. 141, [5 C. C. A. 448] ; *Oliver v. Bank of England,* 1 Ch. Div. (Eng.) 610; *Addington* v. *Allen,* 11 *Wend.* (N. Y.) 374.) Again while the court finds in effect that appellant was familiar with the condition and affairs of the bank at the time of the purchase of the stock, this finding manifestly clashes with the finding which we have just been considering, that he relied upon the published report. Since it is found that he relied upon the published report, it becomes proper to consider what character and extent of reliance he was entitled to place upon it. From plaintiff's testimony it appears that he purchased heavily of the stock of a moribund institution, buying that stock at par when it had previously been purchased by the defendants at fifty dollars per share, and when the report of the expert

accountant fixed a value on it of slightly over thirty dollars a share. Also, we have plaintiff's letter to his intimate friend, Mr. Metcalf, inviting him to purchase at the same price, and giving the figures from the report showing that at that price it was an advantageous purchase. We have, moreover, the verified pleadings of the defendants that the report, in their opinion "represented the true condition and affairs of said bank, and that said report represented the true value of the assets and liabilities of said bank." It is inconceivable that, having solemnly sworn that this was what the report expressed, they should have made any other representation than that to the plaintiff. Besides, that was precisely what the law called upon that report to express. (*Thomas* v. *Taylor,* 224 U. S. 75, [56 L. Ed. 673, 32 Sup. Ct. Rep. 403] ; *Yates* v. *Jones National Bank,* 206 U. S. 158, [51 L. Ed. 1002, 27 Sup. Ct. Rep. 638].) In *Thomas* v. *Taylor* it is said by the supreme court of the United States that the statute requires the report "to contain a true statement of the condition of the bank." In *Smalley* v. *McGraw,* 148 Mich. 384, [111 N. W. 1093, 112 N. W. 915], it is said: "If the directors signing the report knew, . . . prior to signing such report, that the item 'Loans and Discounts' contained paper worth much less than its face value, which would materially affect the value of its stock, they would be individually liable to a purchaser of the stock who relied in good faith upon such report as stating the true financial condition of the bank." And it matters not whether such a report was put forth for the express purpose of inducing any particular individual to purchase. (*Prewett* v. *Trimble,* 92 Ky. 176, [36 Am. St. Rep. 586, 17 S. W. 356] ; *Heard* v. *Pictorial Press,* 182 Mass. 530, [65 N. E. 901] ; *Hubbard* v. *Weare,* 79 Iowa, 678, [44 N. W. 915] ; *Morgan* v. *Skiddy,* 62 N. Y. 319; *Thomas* v. *Taylor,* 224 U. S. 75, [56 L. Ed. 673, 32 Sup. Ct. Rep. 403].) If the statements and representations which were made were in fact false, it is immaterial that the defendants believed that the bank would eventually come through its difficulties, or that the defendants did not intend to cheat the plaintiff. (*Alvarez* v. *Brannan,* 7 Cal. 504, [68 Am. Dec. 274] ; *Bank of Woodland* v. *Hiatt,* 58 Cal. 234; *Groppengiesser* v. *Lake,* 103 Cal. 37, [36 Pac. 1036] ; *Spreckels* v. *Gorrill,* 152 Cal. 387, [92 Pac. 1011] ; *Hubbard* v. *Weare,* 79 Iowa, 678, [44 N. W. 915].) The reliance which plaintiff was entitled

to place upon this report then was a reliance that the report was a true statement of the bank's financial condition and not, as the court found, a mere transcript of the condition of the bank as shown by the bank's books. Moreover, deceit may be negative as well as affirmative. It may consist in suppression of that which it is one's duty to declare, as well as by the declaration of that which is false. If it be so that defendants did not believe and could not have believed that the report contained a true statement of the bank's financial condition, their failure to disclose this fact to the plaintiff in handing him the report forms the foundation of an action for deceit under the principle above stated. (Civ. Code, sec. 1710.)   And, finally, upon this proposition it may not be disputed that plaintiff was justified in relying upon the respondents' representations, either actual or as contained in the report, without further independent investigation of his own.   (*Bank of Woodland* v. *Hiatt,* 58 Cal. 234; *Spreckels* v. *Gorrill,* 152 Cal. 387, [92 Pac. 1011]; *Senter* v. *Senter,* 70 Cal. 621, [11 Pac. 782]; *Dow* v. *Swain,* 125 Cal. 683, [58 Pac. 271]; *Merrill* v. *Florida Land & Imp. Co.,* 60 Fed. 17, [8 C. C. A. 444]; *Union Nat. Bank* v. *Hunt,* 76 Mo. 439.)

On behalf of respondents it is urged that they were men of standing and integrity; that their good faith is shown by the fact that they invested their own money in an effort to save this failing institution; that the general findings of the court upon the question of false representation are entirely in their favor; that the fifteen thousand dollars which they voted to themselves were later, upon suggestion of the bank's attorney, restored to the bank; and, finally, that in all respects they acted with a good faith which is abundantly shown. This statement is made in order that it may not be supposed that the counter contentions of respondents have been overlooked.   The fact, nevertheless, remains that because of the incompleteness, the evasiveness, and contradictoriness of some of the material findings, as well as the absence of other material findings, the judgment cannot be supported and must be reversed.

It is ordered accordingly.

Melvin, J., and Lorigan, J., concurred.

Hearing in Bank denied.