[Civ. No. 5438. First Appellate District, Division One.—July 28, 1928.]

F. M. ZWART, Respondent, v. P. E. LANDFIELD, Appellant.

Erwin C. Easton and E. B. Taylor for Appellant.

Everette C. McKeage for Respondent.

KNIGHT, J.—This action was commenced against the above-named defendants to rescind the sale of corporate stock upon the ground of fraud, and to recover the purchase money previously paid therefor. The trial court held that the company defendant and P. E. Landfield were "one and the same person and are identical," and gave judgment against the latter, from which judgment he has taken this appeal. Insufficiency of the evidence to support the findings and the judgment constitute the grounds of appeal.

We have examined the evidence, and it is evident therefrom, we think, that a fraud was practiced on respondent, and although the testimony is conflicting on several points, we believe that as a whole it is legally sufficient to support the conclusions drawn by the trial court that the fraud was actionable, and entitled respondent to the relief granted.

In narrating the evidence, therefore, we shall mention only those portions which, in our opinion, tend to support the findings and judgment. It may be stated as follows: Appellant was engaged in the business of selling corporate securities under the firm name of Edward Marvin Company, and at the time these transactions with respondent took place was dealing particularly in the sale of the capital stock of a corporation known as the New Dominion Copper Company, which was evidently in a state of collapse, because about the time of the sale of the stock to respondent, or shortly thereafter, it suspended operations. The actual sales of said corporate stock were made through several salesmen employed by appellant for that purpose, and the fraudulent methods claimed to have been employed in inducing people to buy the stock were disclosed at the trial by two salesmen who had been in the employ of appellant about the time the sales to respondent were made. They testified that these methods originated in appellant's office and were practiced with his knowledge and approval. They consisted of the making of misrepresentations to prospective purchasers as to the value of the stock, the quotations of the market reports, the financial condition of the company, its future prospects and the certainty of the investor to make large profits in dealing with the stock; furthermore, that fraudulent practices were indulged in at the office in leading prospective buyers to believe that prominent and influential business men and bankers were investing heavily in the stock. One of the salesmen summarized these methods thus: "The idea is to get the sucker's money."

Respondent, as the evidence shows, was inexperienced in buying securities, and, after reading his testimony, it is apparent that he was readily susceptible to influence and imposition, and evidently the methods above described were used in inducing him to purchase the stock, for he testified that the negotiations were conducted in the following manner: A salesman named Stewart first phoned him at his place of business in Palo Alto and asked him if he wanted "to make some easy money," and, after a brief conversation, which is not important, respondent told Stewart that the thing for him to do was to come to his office. Stewart arrived that afternoon, and, after talking to him

about the New Dominion Copper Company, advised respondent to buy 500 shares. At the same time Stewart exhibited a newspaper which purported to contain the stock market reports, saying that the stock was listed on the New York Curb and the Boston Stock Exchange, and was then selling for two dollars per share and in no time would go up to four dollars per share. Respondent stated that he did not have that much money, and Stewart replied: "You don't need that much money. You buy 500 shares and pay half down, and give me a selling order for 250 and in no time you will have your principal back," saying, also: "I will guarantee you, Mr. Zwart, that the stock will go up in no time." After some further discussion, respondent signed an order authorizing appellant to purchase for him 200 shares at two dollars, paying therefor $400, and he was also charged with and paid an additional $15 as a "service charge" for obtaining the stock.

Four days later, and on May 27, 1924, Stewart returned to Palo Alto and told respondent that he "was a darn fool," that the stock had gone up to four dollars a share, and exhibiting a newspaper, which contained the stock market reports, told respondent he could then double his money by buying 300 shares more, which Stewart said he thought he would be able to obtain for him at the old price of two dollars a share; and after leaving respondent for a few minutes for the ostensible purpose of phoning to San Francisco to ascertain if the stock was still available at the price mentioned, returned and said that it was. Thereupon respondent signed another order authorizing appellant to purchase for him 300 shares at two dollars a share, upon which he made a down payment of $300 and a further payment of $22.50 as a "service charge." Shortly after Stewart left, respondent consulted a newspaper and found the stock listed at only one and a quarter and one and a half. He immediately phoned appellant's office for an explanation and was assured by a Mr. Collins, who was in charge of the office, that the price respondent had seen quoted in the newspaper was an error. Later on, apparently the same day, respondent proceeded to appellant's office in San Francisco, where he met and talked with Collins, and the latter convinced respondent that the low price quoted in the newspaper was a misprint. While discussing the

matter Collins called respondent's attention to a man standing in the adjoining room and told him that he was the acting mayor of San Francisco, naming him; that he had purchased 10,000 shares and that "if a fellow like that buys the stock it is a very good investment"; whereupon Collins induced respondent to purchase an additional 500 shares upon the same kind of an order at two dollars a share, upon which respondent made a down payment of $500, and also paid $68.75 as a "service charge." At the same time, at Collins' suggestion, respondent signed an order authorizing appellant to sell 250 shares of his stock at four dollars, under the belief that he would soon double his money. Some time afterward respondent learned from a broker that the stock was of insignificant value, and shortly afterward respondent served notice of rescission and demanded the return of his money. None of the stock which respondent was induced to buy, and upon which he made a total payment of $1,306.25, was ever delivered to him, nor was any of the stock he authorized appellant to sell for him ever sold.

As indicated, in our opinion the evidence adduced is legally sufficient to sustain the fair inference that appellant knew the representations which were being made as to the condition of the company and the value of its stock were false; and this inference is supported by the further fact that in July, 1924, the sales manager informed one of the salesmen that the company was shut down and doing no business. The representation that the stock was listed on the New York Curb was also shown to be false, it having been stricken therefrom ten days prior to the first sale to respondent; and although it was listed on the Boston Exchange it was on the inactive list and running very low. As to the value of the stock, as shown by the Boston Exchange reports, the evidence discloses that on May 23, 1924, the date of the first sale, it was quoted at prices between one and one-half and two. On May 26th, the day before the second and third sales, it went up to three and one-quarter, but the next day, when the second and third sales were made, it was quoted at only one and three-quarters high, one and one-eighth low and one and three-quarters closing, instead of four, as represented. Neither was there any truth in the representation made by Collins

that the acting mayor of San Francisco was there in the office or that he had purchased 10,000 shares of the stock.

As stated, respondent had no experience in the purchase of corporate stock, and it is plain to be seen that in buying the stock he relied upon the representations made to him as to the value of the stock and the prospects of the company, and particularly with reference to the stock being listed on the New York Curb; and that he would not have purchased the stock had it not been for the making of said representations. Furthermore, we are of the opinion that the trial court was justified in finding that respondent rescinded within a reasonable time after the discovery of the fraud.

Possibly, as appellant contends, some of the representations related more or less to matters of opinion, but expression of opinion, to avoid an action for deceit, should be honestly entertained by the person making the same (*Macdonald* v. *De Fremery*, 168 Cal. 189 [142 Pac. 73]; *Phelps* v. *Grady*, 168 Cal. 73 [141 Pac. 926]; *Barron Estate Co.* v. *Woodruff*, 163 Cal. 561 [42 L. R. A. (N. S.) 125, 126 Pac. 351]); and whether or not representations are of fact or matters of opinion depends largely on the circumstances (*Hall* v. *Mitchell*, 59 Cal. App. 743 [211 Pac. 853]; *Hodgkins* v. *Dunham*, 10 Cal. App. 690 [103 Pac. 351]).

Moreover, the expression of opinion may amount to fraud where it is accompanied by active misrepresentations or concealment, or where it relates to a subject as to which the parties have no knowledge or means of ascertaining the truth (*Hall* v. *Mitchell, supra.*) The general rule is that one has a right to rely on statements of material facts essentially connected with the substance of the transaction where one of the parties is ignorant or inexperienced in regard to matters concerning which material representations are made, and such ignorance is known to the other party, who is also aware that reliance is being placed on his representations, and that the facts are not, and cannot be expected to be, within the first party's knowledge (12 Cal. Jur. 754, and cases cited); and if one material statement be false it is sufficient ground for rescission (*Beeman* v. *Richardson*, 185 Cal. 280 [196 Pac. 774]). The foregoing rules are particularly applicable to

the facts of the present case, and in our opinion sustain the judgment rendered.

Further contention is made by appellant that at the time these transactions took place he was not the owner of the business and therefore cannot be held liable personally for the alleged fraud. With respect thereto the testimony shows that he was admittedly the owner of said business up to January, 1924, at which time he claims that on account of a family disagreement, the nature of which was not disclosed, he gave the business to his wife; but that in the following September he again became the owner. He further claims that during the interim he managed the business for his wife at a salary of $150 a week. During the time he claims that his wife was the owner, however, no changes whatever were made in the operation of the business. His name remained on the door of the offices; the printed stationery was not changed; he continued to hire and direct the services of the employees, and to conduct the business generally the same as he had before the asserted transfer of ownership took place; nor did he revoke the certificate previously filed by him to do business under the fictitious name of "Edward Marvin Trust Company." We think the trial court was justified in concluding, therefore, that appellant was at all times the owner of the business.

The judgment is affirmed.

Tyler, P. J., and Cashin, J., concurred.