[Civ. No. 3637.   Fourth Dist.   June 30, 1947.]
JOHN R. DYKE, Respondent, v. ALBERT ZAISER et al.,
Appellants.

[Civ. No. 3638.   Fourth Dist.   June 30, 1947.]
ALBERT ZAISER et al., Appellants, v. JOHN R. DYKE,
Respondent.

Miller, Higgs, Fletcher & Glen for Appellants.

Rorick, Cottingham & Moore, Rorick & Cottingham and Monroe & McInnis for Respondent.

GRIFFIN, J.—On March 20, 1945, plaintiff and respondent John R. Dyke brought an action for fraud against defendants and appellants, in case No. 4 Civil 3637, to rescind a lease in which appellants leased a store in Oceanside to respondent.

On May 18, 1945, plaintiffs and appellants Albert Zaiser and wife brought an action against defendant and respondent for rents due under the lease, 4 Civil 3638.

The two actions were tried and considered under the same evidence and two separate judgments were rendered. The trial court gave judgment for cancellation of the lease, the return of an $8,000 advance rental paid under its terms less certain credits, and denied appellants any relief under their action for rents. By stipulation the parties agree that the same record may be considered on these two appeals.

Zaiser had leased a store-room (60 x 100 feet) in connection with his contracting business, at a reported price of $75 per month. He was also a city councilman in Oceanside. In November, 1944, during the war activities in that district, he conceived the idea of using the store room as an amusement center and on November 18, 1944, he sublet space therein to operators of various mechanical amusement devices and other concessions. The space rented was occupied by approximately 32 separate concessions, including a hamburger stand, ice-cream stand, Digger machines, and Lite-a-Line machines. The latter machine is a pin-ball type of game with 25 separate units, and from 1 to 25 people can play it at one time. Re-

spondent Dyke had a lease on certain space for two concessions. One consisted of a number of Lite-a-Line games, which games were invented by him, and the other was occupied by "Digger machines." By his lease he was to pay appellant $100 per week on one concession and $50 per week on the other. The rental totaled about $650 per month. These written leases were drawn by a Mr. Cottingham, as attorney for Mr. Dyke, and they provided that in case it should be determined that the operation of the machines was illegal in the city of Oceanside the leases should automatically terminate. According to the testimony of one witness (Bailey) Zaiser listed the rentals he was receiving from the different concessions and that they totaled "approximately $2700, not counting Mr. Dyke's concessions." Part of the space in the store building was not utilized.

The concessions owned by Dyke, who lived in San Gabriel, were operated for him by Mr. Bailey, on a commission basis. Dyke and Bailey had had considerable experience in the operation of amusement centers. Appellants claimed to have little knowledge thereof. In the early part of December, 1944, Zaiser came to the store inquiring for Dyke and told Bailey that he had an opportunity to lease the entire amusement center to one Nathanson, and would like to discuss with Dyke the possibility of leasing it to him because he would rather do that than lease it to Nathanson. Bailey phoned Dyke in Pasadena. Dyke came to Oceanside on December 12th. According to Bailey, Zaiser wrote on an envelope and there itemized the revenue he was getting from the concessions, as above related. He represented it at $2,700 per month, not counting Dyke's concessions, and Bailey then testified that Zaiser said: "If a man like Mr. Dyke or myself—familiar with the show business or amusement business, could take care of it and take it over, we could possibly raise the income quite a bit. . . . He showed it to where he could raise it himself to $3500 or $5000 a month." He further testified that Dyke and Zaiser talked two or three different nights about the lease and on Thursday they came to some oral agreement; that on Friday Zaiser came in and said he had a better offer from a competitior at a rental of $2,000 per month, and if Dyke would meet his offer he would let Dyke have it; that a check for $2,500 was given Zaiser that night; that Zaiser then made arrangements to go to the office of Mr. Cross, his

attorney, the next morning to have the lease drawn (Mr. Cross was also the city attorney); that the next morning (Saturday) they met at the appointed place; that Mr. Cross inquired as to what they wanted in the lease and Zaiser said: ''I want it fixed so that no matter what happens I can get my money''; that Dyke left for San Gabriel and was supposed to come back the following Monday about noon but had car trouble and did not arrive until about 11 o'clock at night; that Zaiser was waiting for him at the amusement center with the lease and said to Dyke: ''If you will sign the lease, give me the check, and we will have the deal all settled''; that Dyke signed it and gave Zaiser an additional check for $5,000. An additional credit for $500 was allowed Dyke for advance payments on the concessions. The lease called for a payment of $36,000 for 18 months' rental. Eight thousand dollars was payable in advance and that sum paid the first two months' and last two months' rent. On the following day, Tuesday, December 19th, Dyke came to the amusement center at about 5 p. m. to take over the business. One-half hour later, the chief of police of Oceanside, accompanied by a deputy sheriff, came in and ordered the closing of almost all of the concessions containing the games. Out of the 32 concessions 22 were ordered closed. As soon as the other operators of concessions in the building were informed of this, almost all of them moved out their equipment. The result was that the crowds that had frequented the amusement center diminished and finally every concessioner left except the operator of the ice-cream stand. The total income from the concessions after the sale and up to July, 1945, averaged about $410.87 per month. After deducting the cost of operation the net profit, not including $2,000 per month rental, for the eight months' period was about $384.12 per month.

In the latter part of January, 1945, Dyke received an anonymous letter indicating that Zaiser had known in advance, prior to the signing of the lease, that the officials were going to close the concessions. The letter is cast in the form of a two-act playlet, indicating that a ''local business man'' was elected to an official position in the city where the plot was laid; that the scene opened in the living room of the home of the local business man. The lessee was described as ''Mr. Sucker.'' The local business man told his friend that ''I put over some other deals . . . but the best one was this last one I put over . . . wherein I cleaned up $8,000 cash in

one lump and got $24,000 more a coming, and then I still got the best racket in town, all thriving and making money for me for years to come.'' He summarized the transaction wherein he started out to exact $200 per month from ''Mr. Sucker'' and finally got him to sign for $2,000 a month, ''but that aint the best of it. . . . You see I heard that before long they was agoing to stop all forms of gambling here in town . . . and the real money to be made was all on them gambling machines we had in there. They was two of em that was a paying off thousands of dollars a day! Well, pretty near that, and if they was to close it I had to get what I was a going to do done fast so I got . . . the deal thru with Sucker . . . boy, I'm a tellin you . . . I had a close call . . . I knew they was goin to close the gambling but I didn't think it was going to be so soon but here the very day I got my attorney to draw up the lease between Mr. Sucker and me . . . and making me that $2000 a month, I gets *tipped off* that the *very next day* they was a going to close down all gambling! So here I was with the lease in my hand and couldn't find Mr. Sucker to get his name on that lease. I was sweating awful. . . . Only a few hours to go and him nowhere in sight. . . . Well I finally got to him and he signed it and I got a check and got my money and did I mop my sweat then. . . . I was safe and got my money and all legal and tied hand and foot, and then Hah hah hah along comes the gang and closes up the gambling, ha, ha, ha, ha, I never laffed so much in all my life. . . . Very next day they came in and closed him up. I sure would a liked to seen his face when he realized that he had been fooled. Hah hah hah. . . . And its legal too. And if he tries to put anything over me, any dishonest deals, I will not stand for it. I got the LAW on MY SIDE.''

Accordingly, when Zaiser came in, the letter was shown to him. He acted unnerved and said that he knew where it came from and stated that he ''guessed he talked a little too much.''

Dyke testified that the letter ''gave him a lead'' and he could use it to advantage; that he told Zaiser he had heard ''quite a bit'' from several sources that Zaiser knew that the concessions were going to be closed when he signed the lease and that he, Dyke, considered it a fraud and was therefore not going to pay him anything more on the lease; that Zaiser admitted at that time ''that he did know it,'' that Chief Coyle had told him that he had been ''a Damn fool—pardon me—to tell me at that time.''

The trial court found generally:

"That . . . for the purpose of inducing the execution of said lease the defendant, Albert Zaiser, represented to the plaintiff that the business carried on in said leased premises was producing a revenue of approximately Twenty-six Hundred Dollars ($2600.00) per month *net* to the defendants and could, with attention and diligence be caused to produce a revenue of at least Five Thousand Dollars ($5,000.00) per month and it is true that plaintiff relied upon such representations and was induced thereby to enter into said lease agreement. That by said representations defendant, Albert Zaiser, intended that plaintiff should understand, and plaintiff did understand that there existed no reason known to said defendant why the business should not continue to operate profitably in the future as it had in the past and that plaintiff believed and relied upon said representations and so understood the representations thus made by defendant. . . . That said representations were false and fraudulent in that defendant knew that said representations were untrue and knew that law enforcement officers of the County of San Diego contemplated and intended, within a period of twenty-four hours after the execution of said lease, to compel the closing of a substantial portion of the business carried on in the leased property. That in truth and in fact within twenty-four hours after the execution of said lease agreement said peace enforcement officers did compel the closing of said machines and did compel the cessation of a material portion of the business operated in said premises and that as a result thereof plaintiff was unable to operate the business in said leased premises at a profit or for enough money to pay the rental agreed to be paid by the terms of said lease"; and that by reason thereof the lease should be canceled.

The $8,000 paid down on the advance rentals was ordered returned less a reduction of $384.12, which was the amount received by respondent over and above the expenses of operation up to the time of the rescission. Judgment was entered accordingly.

In discussing whether the evidence supports the findings, as questioned by appellants, it will be necessary to consider in detail the testimony of some of the witnesses. It was proven beyond doubt that before this transaction was finally closed and the lease signed, Zaiser did know that the officers intended to close certain concessions. The only question pertains to the time when he acquired the knowledge and the

extent of his knowledge as to which machines or concessions they intended to close.

The chief of police, called as a witness for plaintiff, testified that he was familiar with the premises and the parties running them; that he knew Zaiser owned a lease on the building and had put in the amusements because Zaiser told him; that on Monday, December 18, at about 5 p. m. before the lease was signed by Dyke, he spoke to Zaiser and told him the sheriff had called him, stating that the grand jury and the district attorney's office had information that there were some "slot machines operating in Oceanside and he wanted them closed"; that he was going to close "those machines out within 24 hours" and that he should notify the men who had leased the building or concessions too; that he went down that afternoon and saw some of the operators of slot machines in town and told them that "I wanted them taken out," under the sheriff's orders; that on the following day, around 6 p. m. they just "pulled the plugs on the machines" and "that was all there was to it." Some were "Pin Ball machines" (about 4 or 5) and others were "table games," two "Flat Joints," played with cards and a ball. On cross-examination he testified that he disconnected the pin-ball machines because he thought they were automatic pay-off machines; that many months later, after reviewing an appellate court decision, he learned they were not of that type and were lawful, and if he had known that fact then, he would not have interfered with them at all, but he was acting under orders from the sheriff; that he had told Zaiser that the sheriff had given the orders.

Appellant Zaiser took the stand and testified that he obtained permission from the city council to make an exception in the zoning ordinance so he could operate the amusement center in this particular store building. He claimed that he wanted to "get rid of" the business because he was not interested in it; that he had a man named Nathanson who wanted to purchase the lease at the price agreed on by respondent but that he would rather lease it to respondent for reasons explained. He testified that he did not go to Attorney Cottingham to draw the lease because of some political differences they had entertained, and explained why the clause in reference to the right to cancel the lease if the authorities closed the concessions was not included in this lease. On the witness stand he did not deny he was told of the contemplated action of the chief of police and deputy sheriff on the

day the lease was signed. Neither did he deny he had knowledge prior to that time of their contemplated action.

Respondent Dyke testified about the transaction and representations made by Zaiser; that Zaiser explained in detail what the different concessions were paying, i. e., about *$2,700 per month in addition to Dyke's payments*; that Zaiser said "he thought if he could put his time in on it he could make it pay $5000 a month or more"; that "he was sure I could do the same"; that "if I would lease it and put my time in on it it could be made to pay quite a bit." He then testified that he believed those statements and accordingly entered into the lease. The record indicates these representations were made a day or two prior to Friday, the 15th of December, when the $2,500 was paid. It was not until Monday, December 18th, that the written lease was signed. Dyke testified further, however, that he still believed the former statements made by Zaiser on the night of December 18th, when he signed the lease, and that neither Zaiser nor anyone else had informed him about the contemplated closing of the concessions by the authorities; that had he known about it he would not have closed the transaction; that the next day, one hour after he took possession, the officer came and pointed out "certain concessions that had to be closed"; and that "he wanted them out of there by tomorrow"; that he pointed out all the tables, the Lite-a-Line machine, the Diggers, several of the pin-ball games, and a concession where they pitched rings; that the ball game and Dart game were restricted to "pay off in prizes only"; that he went to the several concessioners who were operating the machines in his center and told them to cease their operation; and that he left it up to them to move out their own equipment; that he moved out his Lite-a-Line machine and Diggers; that soon thereafter he received the letter charging Zaiser with previous knowledge of the contemplated closing of the concessions.

The evidence further discloses that Zaiser assigned the leases of the other concessions held by him to Dyke, as part of the same transaction. Some of these leases contained a clause that the lessee concessioners had the right to cancel their leases if the authorities closed them up, and some contained the additional provision that the lessor must return all unearned rents advanced by the lessee in case of cancellation. Apparently Dyke was found to be in a helpless position in this respect, as a result of the combination of circumstances.

Dyke then testified that there was no city ordinance of Oceanside prohibiting the operation of the machines that were in his place of amusement and that he learned from Mr. Cross, the city attorney of Oceanside, on the day of trial of this action, that their method of operation was legal all the time.

Witness Bailey corroborated Dyke's testimony, and in addition, related more claimed conversation with Zaiser in reference to the anonymous letter. It is his story that after the letter was shown to Zaiser, Zaiser sat down and brought the paper "down in his hand on his elbows and shook violently, turned very pale, and beads of perspiration were on his face"; that Zaiser came to the amusement center in February and asked for the letter so he could sue the writer thereof for libel; that Zaiser asked him how business was and said that it was a shame that it got closed up the day we took it over; that he said to Zaiser: "Well, you should know, because you seemed to know it was going to get closed"; that Zaiser said: "Well, Gosh Darn it, I did know it. When I found it out the deposit had already been paid. I considered it a deal. I would have been a ———— fool to tell you about it." Bailey further testified that although certain machines and concessions ordered closed by the chief of police were permitted to operate during the summer months on the beach, he was not permitted again to operate them in the amusement center.

Appellants now argue, generally, that the evidence shows that Zaiser had practically no experience and that Dyke had long experience in the operation of amusement centers and in the possibilities that the operation of borderline machines might be stopped by authorities, and that there was no duty involved upon Zaiser to inform him of that likelihood or that in fact such action was contemplated; that Dyke's familiarity with the income or the probable income of the premises was well known to him; that the past income was not misrepresented to Dyke; that any statements as to its possible future income were "no more than sellers' talk," but were only statements of Zaiser's own opinion as to future profits and were not in fact relied upon by Dyke, nor were those statements actionable; that Zaiser made no statements at any time as to whether the authorities would allow the games or machines to continue to operate or how long the place would remain open, or whether the games or machines were legal or illegal; that since respondent failed to prove that Zaiser had

any knowledge of the contemplated action of the officers until after he had orally agreed to sell the place to respondent, he was not obligated to disclose to him the knowledge he acquired just before the lease agreed upon was signed; that even so, the information given him was that the chief of police intended to close just a few of the machines which would be but a small consequence in the entire operation; that since there was not a confidential relationship between the parties, it was not incumbent upon Zaiser to disclose the information he had in respect thereto; that since the authorities ordered more machines closed than he had information about, he could not be held responsible for their actions; that respondent failed to test in court their authority to prohibit the operation of the concessions, and having ''sat dormant in that respect,'' he cannot blame the appellants; that since these same games ran elsewhere in Oceanside thereafter, respondent was ·apparently authorized to engage in such business; that it was the duty of Dyke to investigate the facts and the law, and rely upon his own judgment rather than any representations made by Zaiser; that fraud must be clearly established; that if the games were legal, the authorities' contemplated interference was not of sufficient importance for him to report it to respondent; that if illegal, then the parties were *in pari delicto* and a court of equity must not act on the part of either party but should leave them where it finds them. It is then claimed that there is no evidence supporting the finding of the court that the appellants had misrepresented the income at $2,600 per month *net* above expenses; that the representation was that $2,600 was the gross income per month. Many cases are cited in support of the several contentions here made.

Respondent recognizes appellants' argument that ordinarily a representation as to what property has produced is considered a representation of fact, while a statement as to what property will produce in the future is ordinarily classed as a statement of opinion and not a representation of a fact. In the present case the parties were dealing mainly with a matter of income and expected income. The property was leased to Dyke for 18 months at a rental of $2,000 per month. What the property had produced in income was of interest as being an indication of what it could be expected to produce in the future, and the amount of rental to be exacted could be justified only upon the expectation that it would continue to produce income substantially in excess of that amount. This

is obvious. For were it otherwise, respondent would not have been interested in entering into the lease. The representation with reference to the income that had been produced or would be produced became highly material to the transaction. Zaiser, according to the evidence, represented that during the period of approximately four weeks, when he operated the center, the place was paying $2,700 per month, *in addition to the rentals paid by Dyke*. The evidence is confusing as to whether the income, as represented, was the net or gross income. The record rather indicates that Zaiser was referring to gross income. However, he testified at the trial that the income was around $2,800 to $3,000 per month, and this calculation *included* an estimate of *$650 per month paid by Dyke*. There was, according to that evidence, a variance of approximately $650 per month between the amount of income, gross or net, testified to by Zaiser at the trial, and the amount he represented to Dyke and in the presence of Bailey. This difference would be of considerable materiality when considering the inducements held out by Zaiser as to contemplated future income. Under the figures testified to at the trial by Zaiser, that is, $2,800 to $3,000 less $650 paid by Dyke, or a gross income of $2,150 or even $2,350 per month, would hardly justify a net rental price of $2,000 per month payable to Zaiser. The testimony is that the cost of operation under Mr. Dyke, exclusive of salaries, commissions and licenses, ranged from about $25 to $138 per month. Zaiser's representations as to the past and future income of the center, in view of his knowledge as to what was going to transpire, was the basis for the fraud as found by the court. The materiality of these representations becomes apparent.

█ It has been frequently held in California that an expression of an opinion which is untrue and which is not honestly entertained and which, when considered with other inducements proved to be false, is material to the transaction, may constitute fraud. (*MacDonald* v. *de Fremery*, 168 Cal. 189 [142 P. 73].)

In *Zwart* v. *Landfield*, 93 Cal.App. 328 [269 P. 740], defendant represented that a certain stock was listed and selling for $2.00 per share and that in no time it would go up to $4.00 per share. The true facts indicated that the stock only had an insignificant value and never did go up to the $4.00 per share. The court said, in holding the evidence sufficient for rescission, that possibly some of the representations

related to matters of opinion, but expression of opinion, to avoid an action for deceit, should be honestly entertained by the person making the same. (Citing cases.) ▇ And moreover, the expression of opinion may amount to fraud where it is accompanied by active misrepresentations or concealment, or where it relates to a subject as to which the parties have no knowledge or means of ascertaining the truth. The general rule is that one has a right to rely on statements of material facts essentially connected with the substance of the transaction where one of the parties is ignorant or inexperienced in regard to matters concerning which material representations are made, and such ignorance is known to the other party, who is also aware that reliance is being placed on his representations, and that the facts are not, and cannot be expected to be, within the first party's knowledge. If one material statement be false it is sufficient ground for rescission. (See, also, *White* v. *Financial Guarantee Corp.*, 13 Cal.App.2d 93 [56 P.2d 550].)

The argument that respondent was in an equal or better position to know whether the amusement center would be closed by the authorities, due to the nature of the machines operated, and his experience in operating them, and that therefore he was bound to make inquiry of the district attorney and grand jury, and that his failure to do so was a negligent omission, to us seems untenable. It would appear from the evidence before us that the machines, as operated, were legal and not illegal. The city attorney of Oceanside was of that opinion. Under the circumstances, respondent was justified in believing that the authorities would not close his concessions. Appellant Zaiser, as city councilman, it seems to us, was, by virtue of his position, in a much better position than respondent to know that those concessions might be closed by the chief of police of Oceanside, and that in fact they were going to be closed. It is not likely that if respondent had inquired of the district attorney or sheriff or grand jury, they would have informed him that on a day certain he was to be raided and closed, and if his operation was legal, respondent would not be expected to make such inquiry.

In *Laraway* v. *First National Bank of La Verne*, 39 Cal. App.2d 718 [104 P.2d 95], it was said that the fact that the means of knowledge may have been open to plaintiff did not necessarily debar her from relief when there was nothing in the evidence which would excite her suspicions and necessarily put her on inquiry.

In *Bank of America* v. *Sanchez*, 3 Cal.App.2d 238 [38 P.2d 787], which was an action involving a note, the evidence showed that the bank officer originally induced the defendant wife to sign the note, under a misrepresentation that *under the law* she could not be held liable for a deficiency. At that time the bank was aware that she had such misapprehension of the law, but did not rectify such misapprehension. The court held that feature of the case constituted part of the basis for the fraud alleged, and found that it was the primary cause in the transaction and that the ultimate result was respondent's act of signing the note. It was there held that such rule prevails under a confidential or fiduciary relationship, *or* where one who has had superior means of information, possesses knowledge of the law, and thereby gains an unconscionable advantage of another who is ignorant and who has not been in a situation to become informed. It was held that under the latter case the right to relief was predicated on the same ground as if the misrepresentations of law were matters of fact.

If the transaction here in question had taken a normal course and had there been no guilty knowledge or fraud on the part of Mr. Zaiser, Mr. Dyke could not have complained because police officers shut down the concessions and forbade their operation, and had Dyke been the party seeking to obtain the lease on the premises, Zaiser might not have been under obligation to express any opinion at all as to the past or prospective income. When, however, he chose to discuss that matter, he was bound by law to make an honest statement of opinion. (*Rogers* v. *Warden*, 20 Cal.2d 286, 299 [125 P.2d 7].) What may constitute a mere expression of opinion under certain circumstances may, in other circumstances, constitute actionable fraud. Ordinarily, if a man was about to sell a piece of property and he correctly stated the amount of rent which had been produced and then gave his opinion as to what rental might be received in the future, such statement, if honestly made, could not be classed as a misrepresentation of fact. Altered circumstances may make such a representation fraudulent. When we analyze the facts involved in the case at bar, in support of the findings and judgment entered, it becomes apparent that under this evidence Zaiser's statements constituted fraud. If all that was involved was Zaiser's expressed opinion that the amusement center would probably produce $5,000 per month, and it developed that the monthly income fell

somewhat short of that amount, and the surrounding circumstances were such as would justify the court in finding that Mr. Zaiser's opinion, thus expressed, was an opinion honestly entertained, there might be some question as to whether such statements constituted fraud. Here, if not during the entire time, at least before this transaction was closed, Zaiser knew that the business was going to be seriously affected by the shutting down of many of the concessions. The fact remains that within 24 hours 22 of the 32 concessions were closed. The closing of any of the concessions would directly affect the income of the amusement center. Zaiser permitted a deal to be consummated, based upon his representations as to past income and his expression as to the income to be anticipated in the future, and at the same time concealed from the prospective tenant the fact that he knew that action would be taken which would detrimentally affect that income. The extent to which it was in fact affected is to be noted when we see that an income of $2,800 per month was automatically reduced to an average income of $410.87 per month. Mr. Zaiser's statement that he believed that an income up to $5,000 could be produced is certainly tantamount to a representation that he believed the profitable operation of the amusement center would continue. It was, in effect, a representation that he knew of no reason why it should not continue. He could not honestly, truthfully, or fairly make that representation when he knew that within 24 hours the operation of the amusement center would be substantially interfered with.

Appellants state the general rule that a vendor is under no obligation to speak concerning the thing which he would sell. Yet, in this connection, under that general rule, if he undertakes to do so, he is bound not only to speak the truth in all he says, but is equally obliged to tell every material fact and not to conceal any facts within his knowledge which might materially qualify such statements as he may have made. (*Macco Construction Co.* v. *Fickert,* 76 Cal. App.2d 295, 299 [172 P.2d 951].)

The general rules on this subject are discussed in 37 Corpus Juris Secundum, page 251, section 17c. There are noted a few decisions to the contrary, but the great weight of authority recognizes that acts such as those here described may constitute a fraud.

See, also, *Kretzschmar* v. *Janss Investment Co.,* 126 Cal. App. 698 [14 P.2d 1069], which involved a transaction

wherein an option was given for the purchase of property. There was given first an option and later a contract of sale. Between the execution of the two agreements permission was given to construct a tremendous drain across the property. The purchaser was not informed of this fact or of the fact that such permission had been given. The court said:

"The respondents were justified in relying upon this option and a duty rested upon the appellants to inform them of any material changes in the subject matter which had taken place subsequent to the option."

By the same token, although the substantial terms of the lease were informally agreed upon in the conversation in Mr. Cross's office, and although a deposit had theretofore been paid, nevertheless Mr. Dyke was entitled to rely upon the representations that had theretofore been made to him and, as stated in the opinion in the Janss case, a duty rested upon the lessor, Zaiser, to inform respondent of any material changes which had taken place subsequent thereto. Dyke had no means of knowing that Zaiser had been warned of the impending action of the peace officers. It was not until an anonymous letter was handed to him that he realized a fraud had been perpetrated. He then charged Zaiser with the fraud and, in effect, Zaiser made statements which might constitute admissions of such charge. It is true that Zaiser did not say in so many words that he knew the police would not interfere with the operation of the amusement center or that he felt the police officers were satisfied with the character of the devices operated therein. Many cases have been cited where it has been held that a man is not necessarily required to state everything he knows about the property involved. ▮ The present tendency, however, is to class concealment as actual fraud in those cases where the seller knows of facts which materially affect the desirability of the property which he knows are unknown to the buyer. (*Clauser* v. *Taylor*, 44 Cal.App.2d 453 [112 P.2d 661]; *Rothstein* v. *Janss Investment Co.*, 45 Cal.App.2d 64 [113 P.2d 465].)

If we assume that Zaiser had no guilty knowledge of the proposed action of the police officers when the conversations leading up to the lease took place, and that therefore his expressions of opinion were honestly made when made, nevertheless, by the undisputed facts, these representations became false the instant he talked with the chief of police. He then knew that action would be taken which would materially affect the income of the property. He knew it would

materially affect the value of the lease. In short, he knew that if Dyke was informed of the impending action, he would not execute the lease at all. Under the circumstances, it is apparent that Zaiser knew that the respondent was relying upon his representations, and that he knew incidents had transpired rendering the representations no longer true. He knew that conditions had changed which materially affected the desirability of the property and he knew that respondent was unaware of the changed conditions. Under these circumstances, his silence, together with the other circumstances related, would constitute fraud.

Under this conclusion, it becomes unnecessary to determine whether the evidence supports the trial court in its finding that Zaiser, *throughout* the negotiations, knew that the police officers intended to take action against the amusement center.

It is generally held that fraud may be established by circumstantial evidence. It could hardly be expected that if a man made a false representation or was concealing knowledge of a fact that would materially affect the transaction, he would willingly admit that he knew of its falsity all the time. Zaiser knew the chief of police would testify as to the time when he notified him of the contemplated closing of the concessions. The anonymous letter accuses him of knowing that the authorities "were goin to close the gambling but I didn't think it was going to be so soon." His reaction to the accusation in the anonymous letter was not a flat denial, but more of an admission.

Considering all of the case, the trial court was justified in inferring and finding that Zaiser possessed such knowledge during the entire negotiations. Direct proof of fraudulent intent is often an impossibility, and proof indicative of fraud may be given by inference, by circumstances surrounding the transaction, and the relationship and interest of the parties. (*Maxson* v. *Llewelyn,* 122 Cal. 195 [54 P. 732]; *Butler-Veitch, Inc.* v. *Barnard,* 77 Cal.App. 709, 714 [247 P. 597]; *Taylor* v. *Osborne-Fitzpatrick Finance Co.,* 57 Cal.App.2d 656 [135 P.2d 598].)

Judgments affirmed.

Barnard, P. J., and Marks, J., concurred.

A petition for a rehearing was denied July 19, 1947, and appellants' petition for a hearing by the Supreme Court was denied August 28, 1947. Schauer, J., voted for a hearing.