## CONSTRUCTION AGGREGATES CORPORATION *v.* STATE OF CONNECTICUT

BALDWIN, C. J., KING, MURPHY, MELLITZ and SHEA, JS.

Argued February 9—decided May 2, 1961

*W. Robert Hartigan,* with whom were *Charles W. Page* and, on the brief, *Ralph C. Dixon,* for the appellant (plaintiff).

*Jack Rubin,* assistant attorney general, with whom, on the brief, was *Albert L. Coles,* attorney general, for the appellee (defendant).

*Martin S. Michelson* and *David M. Shea* filed a brief as amici curiae.

MELLITZ, J.  In 1955, the defendant was engaged in the construction of the Greenwich-Killingly expressway, now known as the Connecticut turnpike. To obtain fill for use as embankment on the project, the defendant entered into a contract with the plaintiff by which the latter was to supply the required material through dredging operations in Bridgeport harbor.  The plaintiff brought this action, pursuant to authorization; 28 Spec. Laws 512, No. 429; to recover a balance alleged to be due for material excavated from the harbor, and damages for losses

the plaintiff claims to have sustained as a result of the defendant's misrepresentation of the nature of the material to be excavated. From a judgment for the defendant, the plaintiff has appealed.

The contract between the parties was entered into on February 15, 1955, and required the plaintiff to dredge in a defined area in Bridgeport harbor and deposit the excavated material on adjacent land in such a manner that the portion usable for embankment would be contained in a stockpile and the unusable portion, consisting of silt, clay, mud and the finest grains, would run off into so-called waste areas or back into the water. The plaintiff agreed to supply all the labor and necessary equipment to do the work at the unit price of $.3856 per cubic yard. Payment was to be made for the material dredged as measured in "place," that is, in the cut. This method of payment involves taking soundings before the commencement, and again after the completion, of the dredging operations, to obtain data for calculating the volume of the material dredged. By the terms of the contract, the quantity of material to be dredged was 4,200,000 cubic yards, and the defendant had the option of increasing or decreasing this quantity by 20 per cent. The defendant exercised its option and reduced the final quantity to 3,833,794 cubic yards, although its actual objective was to obtain 3,250,000 cubic yards. The contract required the defendant to pay for all material dredged, the unsuitable as well as the suitable. A maximum depth was fixed below which the dredging operations were not to be carried on, and the contract provided that material dredged below the permissible depth would not be included for payment. The plaintiff dredged 4,052,995 cubic yards, and the defendant paid the

plaintiff $1,498,214.17, representing payment for 3,833,794 cubic yards with certain adjustments. The defendant refused to pay the sum of $84,523.91 which the plaintiff demanded for the remaining 219,201 cubic yards it had dredged. In the first count of the complaint, the plaintiff seeks a recovery of this amount.

The plaintiff's principal claim is set forth in the second count. Its contention is that the defendant misrepresented in the contract the nature and quantitative distribution of the component materials to be dredged and that, as a result, the plaintiff incurred substantially increased costs and was caused to suffer substantial loss and damage. Specifically, the claim is that by reason of the defendant's misrepresentation, the plaintiff was required to excavate far greater quantities of gravel and coarse sand than it expected to have to and than the defendant represented, and that this resulted in excessive and extraordinary wear and damage to the plaintiff's equipment, with unreasonable stoppages and delays in the work, so that the direct and overhead costs of the plaintiff were greatly increased, it was unable to complete the work within the contract period, and it had to engage the services of a subcontractor to complete the work, at a cost to the plaintiff greatly in excess of the contract price. Under the second count, the plaintiff seeks a recovery in excess of $770,000.

The provision which forms the basis of the claim in the second count is found in item 281 of the contract. This provision is entitled "Hydraulic Borrow" and reads as follows: "Materials: The material to be excavated consists of medium-to-fine sand, a little coarse sand and gravel, and considerable silt and clay. The total of silt and clay com-

prises about 20% of the total material. The silt and clay are found chiefly in layers of dark gray mud. Further information is given on the boring data which are a part of the plans." It is the plaintiff's contention that item 281 is a description of the composition of the material to be found within the dredging area and is in fact and in law a representation of the work which was required to be performed under the contract, a representation which the plaintiff was entitled to, and did in fact, rely on in preparing the bid it submitted for the work. The defendant's position, sustained by the court, is that the description in item 281, considered in the context of the other provisions of the contract, was an expression of the defendant's opinion and not in a legal sense a representation on which the plaintiff was entitled to rely as a basis for its bid.

The pertinent provisions of the contract, in addition to item 281, are set forth in the footnote.[1] The boring data referred to in item 281 are shown on a

---

[1] "This project consists of dredging material by the hydraulic method from Bridgeport Harbor and stockpiling the material in three contiguous areas located near the Bridgeport-Stratford Town Line between Lordship Meadow Road and Lewis Cut. . . .

"There will be one pay item for the work related directly to the removal of the dock and a portion of the pier. For all the other work of this contract there will be one pay item, 'Hydraulic Borrow', which will be for hydraulic dredging and stockpiling the dredged material and all incidental work, whether or not specifically stated herein."

Under scope of work, the contract provides: "The major work of this contract consists of dredging a large quantity of material from Bridgeport Harbor and placing it by the hydraulic method on Stockpile Area 'A', as shown on the plans and described herein. . . ."

Under item 281 appears the following: "Description: Under this item the Contractor shall excavate the earth material in Bridgeport Harbor, as shown on the plans, and place it in Stockpile Area 'A' and Waste Areas 'B' and 'C'. The excavating and placing shall be done by the hydraulic method. . . .

boring data sheet on which appears the following statement: "The information, including estimated quantities of work, shown on these sheets is based on limited investigations by the State and is in no way warranted to indicate the true conditions or actual quantities or distribution of quantities of work which will be required."

"Method of Measurement: The volume for payment will be determined by measuring the amount of excavation, using the average and area method from the result of the initial cross-sections, of the area to be dredged shown on the plans, and the final cross-section taken after completion of the excavation. However, any excavation deeper than the permissible overdredging depth of three feet will not be included for payment. . . .

"Basis of Payment: All material excavated within the specified limits and placed and accepted in the designated areas will be paid for at the contract unit price per cubic yard for 'Hydraulic Borrow' complete in place, which price shall include all material, equipment, fuel, labor, and work incidental to the completion of the work, except for work related directly to the removal of the dock and a portion of the pier, in accordance with these Specifications and Special Provisions."

The contract contains further the following exculpatory provisions:

"The quantities shown on the proposal form are approximate only and are given as a basis of calculation upon which the award of contract is to be made. The Department does not assume any responsibility that these quantities shall obtain in the actual construction and the Contractor shall not plead misunderstanding or deception because of any variation between estimated and final quantities. The Engineer reserves the right to increase or decrease any or all of the quantities shown on the proposal form as may be necessary to properly complete the project.

"The Bidder is required to examine carefully the site of the work, and the proposal form, plans, special provisions, specifications and contract form for the work contemplated, and it will be assumed that he has judged for and satisfied himself as to the conditions to be encountered, as to the character, quality and quantities of the work to be performed, materials to be furnished, and as to the requirements of above documents.

"Payment will be made for the actual quantity of authorized and accepted work done or material furnished under each of the several items."

To be entitled to a recovery under the second count, the plaintiff was required to establish that the description in item 281 of the materials constituted a representation of a material fact on which the plaintiff was entitled to rely and on which it did in fact rely, to its damage. *E. & F. Construction Co.* v. *Stamford,* 114 Conn. 250, 260, 158 A. 551. The court found the following facts, which are not subject to correction. The notice to contractors was published on December 27, 1954. Bids were requested to be submitted by January 17, 1955, the time being later extended to January 24. The plaintiff was the successful bidder. The contract, entered into on February 15, 1955, required completion within 350 calendar days after the plaintiff received notice to start work. The starting date was March 21, 1955. The plaintiff did not have available equipment of adequate capacity to do the work it contracted to do. After entering into the contract, the plaintiff purchased in Louisiana a dredge known as the "Mississippi," a converted lighthouse tender which had been used on the Mississippi River. It was old, not equipped to do the job required, and had to be reconditioned, re-equipped, and hauled to Bridgeport harbor from Louisiana before it could be put into operation. Work with the "Mississippi" was not started in Bridgeport harbor until June 29, 1955. A subcontractor of the plaintiff began work with a fifteen-inch dredge on April 16, 1955.

In October, November and December, 1955, the defendant, concerned about the plaintiff's failure to keep up with the production schedule, repeatedly demanded that the plaintiff accelerate performance of the work and indicated that the defendant might be forced to call the performance bond. At about this time, the plaintiff began to complain that the

materials in the harbor were coarser than it had expected to find. Gravel and coarse sand are more difficult and more expensive to pump than silt, clay and medium to fine sand. As the coarseness of the material introduced into the suction pipe of a hydraulic dredge increases, the ability of the dredge to move the material declines. An increase in the length of the discharge line and the height to which the material must be lifted increases the resistance to the flow and thereby reduces the velocity of the water and the volume of solids transported.

The boring data referred to in item 281 were prepared by the defendant. The data portrayed the location and depth of fifteen borings taken by the defendant and described samples of the material encountered at various levels in the course of each boring. The defendant had caused sieve analyses to be made of thirty-two samples of the material bored from the dredging area, and the laboratory reports of the results of these analyses were available for examination after October 1, 1954. The defendant, in taking its borings, analyzing them, and reporting the findings on the boring data sheet, followed good engineering practice. All the information the defendant had with relation to the contract, including the boring data, was available for examination by any prospective bidder. The plaintiff, prior to submitting its bid, did not seek permission to examine the actual boring samples or the results of the sieve analyses. It had extensive experience in the dredging business and knew that borings are only a rough indication of what might be found between the holes from which the borings were taken. Before entering into the contract, the plaintiff made probings of the harbor, and shortly after the execution of the contract it had borings

taken in the area where the dredging was to be done, in order to determine the condition of the harbor. The plaintiff prepared a boring data sheet on which it compiled the data it obtained from these borings. Its findings and conclusions corroborate the findings made by the defendant from its boring data; and the results of the borings taken by the plaintiff and recorded on its boring data sheet are consistent with the description, in item 281 of the contract, of the material.

The court concluded that the description in item 281 of the material did not constitute a representation on which the plaintiff was entitled to rely in preparing its bid; that the plaintiff, in submitting its bid, did not in fact rely on the description but relied on its own investigation, being aware that the nature of the material in the harbor could not be determined with any degree of accuracy; and that the boring data sheet reported what the defendant found at the places where the borings were taken and was not a representation of the general conditions of the earth in the entire harbor area. The court concluded further that any increased costs to the plaintiff, and its failure to meet the production schedule, were due to inadequate and inefficient equipment and to the plaintiff's not starting the job on time, and not to the fact that the material dredged was coarser than expected.

The theory on which the plaintiff relies for a recovery on the second count is that the facts here are essentially similar to those found in *E. & F. Construction Co.* v. *Stamford,* 114 Conn. 250, 158 A. 551, and that the principle on which a recovery was there allowed is applicable and governs the situation here. The plaintiff cites and relies also on *Hollerbach* v. *United States,* 233 U.S. 165, 34 S.

Ct. 553, 58 L. Ed. 898. Each of these cases contains elements not found in the case at bar.

The basis of the decision in the *E. & F. Construction Co.* case, supra, 258, was that the statement in the specifications as to the nature of the subsoil was in the nature of a warranty. A recovery was allowed as for a breach of warranty. The holding followed from a finding by the trier that the city had made representations as to subsurface conditions which carried the assertion of superior information and were made to supply information to bidders, who were expected to act on it, and were entitled to act on it, in making their bids. Id., 260. It was found in that case that the plaintiff was entitled to rely, and did rely, on the representations and was induced by them to enter into the contract. The opinion noted that if a bidder had independent knowledge of the conditions, he could not claim to have been misled. Id., 261. The plaintiff in the case at bar overlooks significant clauses in the contract which were not present in the *E. & F. Construction Co.* case, and findings of fact, supported by substantial evidence, which are directly contrary to the findings in that case. The statements in item 281 which the plaintiff seeks to treat as representations were made in the context of the several exculpatory clauses contained in the contract documents, and particularly in the boring data sheet. No similar exculpatory clauses were incorporated in the contract involved in the *E. & F. Construction Co.* case. In these clauses, the defendant specifically warned bidders that the information obtained from the boring data "is based on limited investigations by the State and is in no way warranted to indicate the true conditions or actual quantities or distribution of quantities of work which will be required."

The defendant was entitled to limit its commitment to bidders, and it clearly brought home to them that it was making no representation as to the underwater conditions which might be found in the actual performance of the work. The contents of item 281, considered in the context of the other pertinent provisions of the contract, could not reasonably have been understood by a bidder as a representation by the defendant of the conditions in the entire harbor area where the dredging operations were to be carried on. The court was warranted in concluding that the language of item 281, in the light of the other contract provisions, was no more than an expression of opinion, based on the boring data, as to the nature of the material the defendant believed would be encountered, and that the plaintiff was not entitled to rely on the description in item 281 without relating it to the qualifying language found in the boring data sheet, to which reference was specifically made in item 281.

In the *Hollerbach* case, supra, the contract was for the repair and reconstruction of a dam which had been constructed by the government. It was held that when the specifications spoke with certainty as to the conditions to be encountered, the contractor had a right to rely on the government's superior knowledge of a fact concerning which it might be reasonable to assume the government spoke with knowledge and authority. Here, on the contrary, both parties were dealing with unknown factors, and the plaintiff was made aware, by the language on the boring data sheet, that the defendant did not profess to do more in item 281 than to present the data it had obtained by its borings. The plaintiff had wide experience in the dredging business. It knew of the uncertainties

involved in endeavoring to determine underwater conditions, and that the borings taken by the defendant revealed only the conditions at the points of the borings. It knew that the deductions drawn might prove untrue when the dredging operation went forward. No claim is made of bad faith on the part of the defendant or that the information in the boring data sheet did not correctly reflect the results of the borings taken by the defendant. The plaintiff was warned to investigate for itself, and when it took its own borings, the data it acquired were consistent with the results of the defendant's borings.

The court's conclusion that the plaintiff failed to establish a basis for a recovery on the second count is amply supported by unchallengeable findings. The following observation from *MacArthur Bros. Co.* v. *United States,* 258 U.S. 6, 11, 42 S. Ct. 225, 66 L. Ed. 433, is pertinent to the situation here: "Its [the company's] investigation may or may not have been adequate. It, however, took its chances on that. But in reality there was no representation by the Government nor is it alleged that the Government had knowledge of the conditions or means of knowledge superior to the knowledge of the Company. The latter acquired knowledge only by the aid of divers as its work progressed. Such being the situation, does not the case present one of misfortune rather than misrepresentation?" Accord, *Arthur A. Johnson Corporation* v. *Commonwealth,* 318 Mass. 88, 93, 95, 60 N.E.2d 364; *Weston* v. *New York,* 262 N.Y. 46, 51, 186 N.E. 197; *Scherrer* v. *State Highway Commission,* 148 Kan. 357, 365, 80 P.2d 1105; *Inland Construction Co.* v. *Pendleton,* 116 Ore. 668, 679, 242 P. 842; *Webb-Boone Paving Co.* v. *State Highway Commission,* 351 Mo. 922, 929,

173 S.W.2d 580; *East Peoria* v. *Colianni & Dire Co.*, 334 Ill. App. 108, 115, 78 N.E.2d 806.

As to the recovery sought by the plaintiff in the first count for 219,201 cubic yards of material dredged, it is not disputed that 181,167 cubic yards of this material consisted of material "over-dredged," that is, dredged below the permissible depth provided for in the contract. It was expressly agreed that material so dredged would not be included for payment. The remaining 38,034 cubic yards of material for which a recovery is sought in this count consists of material lost by reason of an imperfection in the dike, which the plaintiff was under an obligation to maintain. There was no error in the denial of a recovery on the first count.

There is no error.

In this opinion the other judges concurred.