STATE OF CONNECTICUT *v.* THE AMERICAN NEWS COMPANY ET AL.

KING, C. J., MURPHY, SHEA, COMLEY and SHAPIRO, JS.

Argued January 7—decided June 16, 1964

*H. Meade Alcorn, Jr.,* with whom were *David M. Shea, Ralph G. Elliot* and, on the brief, *Alfred F. Wechsler,* for the appellants (defendants).

*Jack Rubin,* assistant attorney general, with whom, on the brief, was *Harold M. Mulvey,* attorney general, for the appellee (state).

COMLEY, J. The finding discloses the following facts: In July, 1955, the plaintiff, the state of Connecticut, solicited bids for the operation of restaurants to be built and equipped by the state on the Connecticut Turnpike. By a letter dated July 29, 1955, the highway commissioner transmitted to the predecessor of the named defendant and to others a set of documents constituting the invitation to bid for the food concession on the Connecticut Turnpike. The named defendant and its predecessor

will be referred to indiscriminately as the defendant. One of the documents included in this invitation to bid was a copy of the February 1, 1954, report of Coverdale and Colpitts, a firm of consulting engineers. This report had been prepared for the highway commissioner as a gauge for estimating traffic flow on the turnpike. The traffic study was made before the Connecticut Turnpike was designed, and there was no existing highway which could then serve as a basis for a precise comparison.

The Coverdale and Colpitts report of February 1, 1954, noted the similarities between the Connecticut and New Jersey turnpikes as to their respective lengths, areas of population served, and type of traffic anticipated. The report estimated the traffic flow on the assumption that there would be eight barrier-type toll stations with a toll rate of fifteen cents per passenger car at each station; it contained no mention of special low-rate or commuter tickets for short-haul passenger cars; and it estimated traffic flow on the hypothesis that out-of-state access highways would be completed by estimated dates. The report pointed out that failure to complete such access highways by the estimated dates was possible and that such delays would affect the amount of Connecticut Turnpike traffic.

On March 23, 1955, the highway commissioner requested additional information from Coverdale and Colpitts concerning estimated traffic and revenue on the proposed turnpike. In response to this request, Coverdale and Colpitts transmitted to the highway commissioner two reports, one dated April 29, 1955, and one dated May 27, 1955. The report of May 27, 1955, recommended that the toll rates for passenger cars at the four toll stations west of New Haven be increased from fifteen to

twenty-five cents; it estimated that such an increase in toll rates would result in a 23 percent decline in "toll-station vehicle-trips" for the year 1958; it estimated that, with such toll increases, over 55 percent of the passenger-car traffic through the toll stations west of New Haven would pass through only one toll station and that only 10.5 percent of the passenger-car trips west of New Haven would pass through all four toll stations; that the toll-station vehicle trips for 1959 and 1960 would decrease as the toll rate increased; and that the number of out-of-state passenger cars would be less than anticipated in the 1954 report. The report of May 27, 1955, also discussed the issuance of low-rate commuter tickets as soon as the turnpike was opened from Greenwich to Branford. The bulk of the trips estimated on the Connecticut Turnpike was characterized as relatively short-distance trips, and it was estimated that the number of trucks using the turnpike would be less than the number anticipated in the 1954 report.

The reports of April 29, 1955, and May 27, 1955, were not included with the 1954 report in the state's invitation to bid on July 29, 1955, although those reports were in the possession of the highway commissioner on that date. The highway commissioner did not disclose the information included in those reports to the defendant or even mention the fact that such reports existed. The defendant did not learn of the existence of the reports of April 29, 1955, and May 27, 1955, until the trial of the present case.

On August 10, 1955, the defendant submitted its bid of $801,201 as an annual guaranteed minimum rental, and this bid was accepted by the state as the highest bid received. A contract was executed

between the plaintiff and the defendant on January 12, 1956, under the terms of which the state was to build and equip eight restaurants on the Connecticut Turnpike, and the defendant was to operate them until June 30, 1968, for a monthly rental of 14 percent of the gross sales, with the proviso, however, that the defendant guaranteed an annual minimum rental for all eight restaurants of $801,201. Paragraph 11 of the instructions to bidders, incorporated by reference in the contract, referred to the Coverdale and Colpitts report as a source for estimated traffic volume and established "as a basic standard measure, the Coverdale & Colpitts forecast that there will be recorded at the eight toll stations on the Turnpike, during the calendar year 1958, a total of 44,940,000 'toll-station vehicle-trips.'" The same paragraph, having set this forecast as an estimated figure, proceeds to provide an adjustment in the rent in the event that the traffic does not reach the estimated figure: "If the number of 'toll-station vehicle-trips' in any fiscal year commencing July 1, 1958 should be less than 44,940,000, the Commissioner will reduce the concessionaire's Minimum Guarantee for that fiscal year by a percentage equivalent to a percentage of reduction in toll-paying transactions below the 44,940,000 standard measure." There was no representation or guarantee by the plaintiff that there would be 44,940,000 toll-station vehicle trips in any one year. The contract further provides that "[t]he Turnpike will be a toll road using a barrier type toll collection system which will allow toll-free use of the Turnpike for short distances and local trips."

The state established passenger-car toll rates of twenty-five cents at each of the eight toll stations on the Connecticut Turnpike, effective January 2,

1958. The state began to sell commuter tickets for passenger cars at the rate of eight and one-third cents per ticket, instead of the regular twenty-five cent toll, beginning January 2, 1958. At the time of the trial, the Cross-Bronx Expressway link in New York had not yet been completed and was not expected to be completed before the end of 1963.

The number of toll-station vehicle trips on the Connecticut Turnpike in the fiscal year July 1, 1958–June 30, 1959, was 31,122,549, of which 3,150,977 were taken by passenger-car drivers using commuter tickets. In the fiscal year July 1, 1959–June 30, 1960, the number of toll-station vehicle trips was 43,589,831, of which 4,725,748 were taken by passenger-car drivers using commuter tickets. The number of toll-station vehicle trips in the fiscal year July 1, 1960–June 30, 1961, was 48,976,134, of which 5,928,500 were taken by passenger-car drivers using commuter tickets.

The annual minimum guaranteed rental of $801,201 became effective on September 1, 1959, the first month in which all eight restaurants were in full operation. Since that time, the defendant has refused to pay the guaranteed annual minimum but has instead paid to the state 14 percent of its gross sales, which is a lesser amount than the guaranteed annual minimum, as adjusted. The trial court found that the defendant owes the plaintiff rent in the amount of $374,632.88 for the period September 1, 1959, to June 30, 1960, and $483,280.30 for the period July 1, 1960, to June 30, 1961.

The defendant contends that the plaintiff's failure to transmit the Coverdale and Colpitts reports of April 29, 1955, and May 27, 1955, to the defendant prior to the time the defendant submitted its bid constituted a constructive fraud upon the defendant.

When the plaintiff invited the defendant and others to bid on the food concession by a letter dated July 29, 1955, the plaintiff had copies of three Coverdale and Colpitts reports in its possession. The defendant admits that the plaintiff had no duty to give any information about the prospective operation of the turnpike to the defendant. The defendant argues, however, that once the plaintiff sent the report of February 1, 1954, to the defendant as part of the invitation to bid, the plaintiff then became obligated to make a full disclosure of the reports of April 29, 1955, and May 27, 1955.

In support of its claim, the defendant refers to the following statement in 23 Am. Jur., Fraud and Deceit, § 83: "It is firmly established that a partial and fragmentary disclosure, accompanied with the wilful concealment of material and qualifying facts, is not a true statement, and is as much a fraud as an actual misrepresentation, which, in effect, it is. Telling half a truth has been declared to be equivalent to concealing the other half. Even though one is under no obligation to speak as to a matter, if he undertakes to do so, either voluntarily or in response to inquiries, he is bound not only to state truly what he tells, but also not to suppress or conceal any facts within his knowledge which will materially qualify those stated. If he speaks at all, he must make a full and fair disclosure. Therefore, if one wilfully conceals and suppresses such facts and thereby leads the other party to believe that the matters to which the statement made relate are different from what they actually are, he is guilty of a fraudulent concealment."

Among the cases cited by the defendant in support of its position is *American Bonding Co.* v. *Fourth National Bank*, 206 Ala. 639, 91 So. 480. That case

concerned a situation in which a bank, upon request of a ward, disclosed that the guardian had closed out his guardianship account with the bank but concealed the fact that the funds had been fraudulently used to pay the guardian's debt to the bank. Other cases cited by the defendant on the issue of fraudulent concealment include the following. In *Rogers* v. *Warden,* 20 Cal. 2d 286, 125 P.2d 7, the defendants induced a widow with no business experience to sign away her ownership of certain mineral rights on the representation that her signature was merely a necessary mechanical gesture to clear the title for the owner of the lots, concealing from her the fact that she had certain rights in the property. *Dyke* v. *Zaiser,* 80 Cal. App. 2d 639, 652, 182 P.2d 344, concerned the lease of certain premises for amusement purposes. The lessor represented to the lessee that a stipulated volume of business had been established. At the time these representations were being made, however, the lessor knew that the police planned to shut down a substantial portion of the premises. In *Berry* v. *Stevens,* 168 Okla. 124, 31 P.2d 950, the defendant, through an agent, purchased certain lands. The agent volunteered information to the grantors concerning the oil fields present on the land but neglected to mention a large oil well which had recently been completed. In *Newell* v. *Randall,* 32 Minn. 171, 19 N.W. 972, the defendant purchased goods on credit. He was requested to state his financial position. In so doing he recited his assets but neglected to state the substantial amounts of money he owed to others. In *Kraft* v. *Lowe,* 77 A.2d 554 (D.C. Mun. Ct. App.), the seller of a house discussed the plumbing system but neglected to include the fact that the house was not connected to the public sewer. In *Twing* v.

*Schott,* 80 Wyo. 100, 338 P.2d 839, the defendants stated that the sewage system of a trailer court was adequate and that it was connected to city water. The sewage system was in fact unworkable, and there was an additional charge required for water provided by a private company. *Sullivan* v. *Ulrich,* 326 Mich. 218, 40 N.W.2d 126, concerned a vendor who, when asked if the house had termites, stated he had no knowledge of such a condition. Actually, the house was infested with termites, and the vendor had been so informed at an earlier time. In *Dennis* v. *Thomson,* 240 Ky. 727, 43 S.W.2d 18, a person was induced to purchase shares of stock by a prospectus which did not fairly represent the corporation's business situation.

The Restatement of Torts states: "A statement in a business transaction which, while stating the truth so far as it goes, the maker knows or believes to be materially misleading because of his failure to state qualifying matter is a fraudulent misrepresentation." Restatement, 3 Torts § 529.

The facts in the instant case are substantially different from the circumstances presented in the cases and authorities cited above. The plaintiff in the present case was not a shrewd businessman who took unfair advantage of one unlearned in the affairs of business. The defendant was certainly in a position to have more knowledge of the business of restaurants than was the plaintiff. Nor did the plaintiff make statements which, while stating the truth, were materially misleading because of their failure to state qualifying matter. Both parties must have been acutely aware of the myriad of contingencies which might possibly arise out of business dealings concerning a highway not yet built or even finally designed. To make out a

case of misrepresentation, a party must show a representation of a material fact on which he was entitled to rely and on which he did in fact rely to his damage. *Construction Aggregates Corporation* v. *State,* 148 Conn. 315, 321, 170 A.2d 274; *E. & F. Construction Co.* v. *Stamford,* 114 Conn. 250, 260, 158 A. 551.

With its invitation to bid, the plaintiff sent to the defendant a copy of the February 1, 1954, Coverdale and Colpitts report. This report is entitled "Estimated Toll-paying Traffic and Revenues of the Proposed Expressway in Connecticut from Greenwich to Killingly." The report is nothing more than what it purports to be—an estimate. In no way did the plaintiff represent that the volume or kind of traffic anticipated by this report was to be considered as a guarantee or a certainty. The plaintiff did not state that the traffic conditions or type of traffic on the Connecticut Turnpike would be substantially similar to the conditions on the New Jersey Turnpike. The report merely compared the two turnpikes because there was no existing highway which could then serve as a more exact basis for a comparison with the proposed Connecticut Turnpike. The plaintiff, of course, could not guarantee the date when out-of-state access highways would be completed. It also could not guarantee and did not represent that the toll rate would remain at the fifteen-cent rate postulated in the 1954 report or that no low-rate commuter tickets would be issued. Section 13-164 of the General Statutes provides that the revenue derived from tolls must be at least sufficient to pay the principal and interest on the bonds authorized to finance the highway as they become due. This statute must be considered a part of the contract between the plaintiff and the defend-

ant. "It is true that statutes existing at the time a contract is made become a part of it and must be read into it just as if an express provision to that effect were inserted therein, except where the contract discloses a contrary intention." *Ciarleglio* v. *Benedict & Co., Inc.,* 127 Conn. 291, 293, 16 A.2d 593. The plaintiff thus made no representations to the defendant concerning the volume or type of traffic which would use the Connecticut Turnpike. The 1954 report was transmitted to the defendant merely as an estimate or a statement of opinion which might be useful to the defendant in making its bid. Paragraph 11 of the instructions incorporated in the contract adjusts the minimum rental in the event that the total number of toll-station vehicle trips falls below the estimated number.

The defendant makes much of the fact that the plaintiff had in its possession the reports of April 29, 1955, and May 27, 1955, but did not include these reports in its invitation to bid. The two reports, like the 1954 report, were only estimates. They estimated that the character of the traffic on the Connecticut Turnpike would be somewhat changed if the toll rates were increased to twenty-five cents and if low-rate commuter tickets were sold. However, as the 1954 report was only an estimate made by Coverdale and Colpitts and in no way served as representations of fact or definite statements by the plaintiff, the plaintiff had no duty to submit the reports of April 29, 1955, and May 27, 1955, with its invitation to bid. We are unable to accept the defendant's claim that an estimate or an opinion, expressed in 1954, concerning the traffic on a highway which was then only being designed and was not completed until five years later could be relied on as a representation of a matter of fact.

We now take up the defendant's claim that the plaintiff is estopped by its inequitable conduct from enforcing the contract. "For the application of the doctrine of equitable estoppel, there must generally be some intended deception in the conduct or declarations of the party to be estopped, or such gross negligence on his part as amounts to constructive fraud, by which another has been misled to his injury." *Bland* v. *Bregman,* 123 Conn. 61, 65, 192 A. 703, quoting *Monterosso* v. *Kent,* 96 Conn. 346, 350, 113 A. 922, which, in turn, quoted *Brant* v. *Virginia Coal & Iron Co.,* 93 U.S. 326, 335, 23 L. Ed. 927. "In a case where . . . silence is the conduct relied upon to give rise to the estoppel, the existence of circumstances which impose a duty upon the one claimed to be estopped to disclose the fact which is known is essential. . . . But there is no duty to speak where the facts are equally within the knowledge of both parties or where the one claiming the estoppel, though he has not in fact equal knowledge, has convenient and available means of acquiring it. . . . It is, moreover, necessary that the silence be such as would naturally mislead the other party . . . and that the party claiming the estoppel has been or will be subjected to loss unless he can have the advantage of it, and there is no presumption in his favor." *Flaxman* v. *Capital City Press, Inc.,* 121 Conn. 423, 430, 185 A. 417.

The defendant contends that the failure of the plaintiff to transmit the Coverdale and Colpitts reports of April 29 and May 27, 1955, to the defendant along with the invitation to bid was so grossly negligent as to amount to a constructive fraud. The defendant argues that the plaintiff's silence was such as would naturally mislead the defendant because it deprived the defendant of essential facts,

that the defendant was misled, and that as a result of this misleading silence the defendant has been injured.

The doctrine of estoppel has no application to the present case. The plaintiff's silence did not prevent the defendant from learning that out-of-state access highways would be delayed. Such information was equally and easily available to both parties. The Coverdale and Colpitts report of February 1, 1954, was nearly a year and a half old at the time the defendant made its bid. Also, the defendant was chargeable with knowledge that the toll rates might be increased or that low-rate commuter tickets might be issued. If the defendant wanted more recent and accurate information concerning these matters, it could have made inquiries of the highway commissioner. The plaintiff never suggested that the 1954 report was all-inclusive or that the defendant should not seek additional or more advanced information. The reports of April 29 and May 27, 1955, did nothing more than estimate what contingencies might arise if certain factors were in effect during the operation of the then proposed highway. The neglect of the state to forward such estimates to the defendant did not constitute the withholding of material facts. It is fundamental that a person who claims an estoppel must show that he has exercised due diligence to know the truth and that he not only did not know the true state of things but also lacked any reasonably available means of acquiring knowledge. *Spear-Newman, Inc.* v. *Modern Floors Corporation,* 149 Conn. 88, 91, 175 A.2d 565; *Myers* v. *Burke,* 120 Conn. 69, 76, 179 A. 88.

We are likewise unable to accept the defendant's claim that it is entitled to a reformation of the con-

tract by a revision of the guaranteed minimum rent. "If, by reason of mutual mistake or by reason of a unilateral mistake which is coupled with fraud or inequitable conduct on the part of the other party, a written agreement does not express the true intent of the parties, the agreement may be reformed." *Rodie* v. *National Surety Corporation,* 143 Conn. 66, 69, 118 A.2d 908; *Seymour Water Co.* v. *Horischak,* 149 Conn. 435, 442, 181 A.2d 112. The defendant does not contend that there was any mutual mistake involved in the contract of January 12, 1956; no evidence of a unilateral mistake is apparent; and even if there were a unilateral mistake, the plaintiff's conduct was not fraudulent or inequitable for reasons already given. The defendant therefore is not entitled to reformation of its contract with the plaintiff.

The defendant further argues that the contract of January 12, 1956, is infected with the defects of vagueness and absence of mutuality, either of which defects would render the contract unenforceable. There is no absence of mutuality. Under the terms of the contract, the plaintiff was to build and equip eight restaurants on the Connecticut Turnpike. The defendant is to operate these restaurants until June 30, 1968, for a certain monthly rental. The contract expressly provides for an adjustment of the rent until all the restaurant facilities should be in full operation. The plaintiff also undertook normal maintenance of the restaurant facilities. Each party thus has certain rights and duties under the contract. The contract is to remain in effect until June 30, 1968. Neither party can unilaterally terminate the contract before that date. There is no absence of mutuality.

On the claim of vagueness, the defendant makes

much of the following language in the contract: "If the State . . . shall determine that the contractor has violated the intent of the specifications, the State reserves the right to void the contract, to seize the performance bond as liquidated damages, and to assign the contract to another operator for the balance of the contract period, or to readvertise the contract." The defendant maintains that the meaning of the words "intent of the specifications" is so vague that the plaintiff, in effect, has a license to void the contract almost at will. The short answer is that the plaintiff does not in fact have any right to cancel the contract unilaterally except so far as provided by the contract. Presumably, the words "intent of the specifications" have meaning and were meaningful to the parties at the time the contract was executed. It does not appear that the defendant then made any objection to them. Furthermore, the plaintiff has made no effort whatever to void the contract but instead has brought the present action to compel performance by the defendant. "The construction and legal effect of a contract 'cannot be changed or varied by reason of its inconvenience to the parties, or the unreasonableness of the terms.'" *Whitaker* v. *Cannon Mills Co.,* 132 Conn. 434, 440, 45 A.2d 120, quoting *Lakitsch* v. *Brand,* 99 Conn. 388, 393, 121 A. 865. If a provision is capable of two possible interpretations, the one which favors the validity of the instrument is preferred. *Bassett* v. *Desmond,* 140 Conn. 426, 431, 101 A.2d 294.

The final claim advanced by the defendant is that if the plaintiff is entitled to any damages, they are limited by the contract to $200,000. Paragraph 34 of the instructions to bidders, incorporated by reference in the contract, provides: "Before the lease shall become operative, and at the time of the

signing of the contract, the successful bidder shall file with the State Highway Commissioner a performance bond in the amount of 25% of the guaranteed minimum annual rental adjusted to the nearest $1000 figure, on the standard State Highway Department Contract Bond form, said bond to be for the full term of the life of the contract. Negotiable United States Government securities of a series acceptable to the Treasurer of the State of Connecticut may be offered in lieu of the commercial bond. If the State of Connecticut shall determine that the contractor has violated the intent of the specifications, the State reserves the right to void the contract, to seize the performance bond as liquidated damages, and to assign the contract to another operator for the balance of the contract period, or to readvertise the contract." The defendant argues that if the plaintiff is entitled to recover anything under the contract, the amount of its recovery is limited by paragraph 34 to $200,000, which is 25 percent of the guaranteed minimum annual rental adjusted to the nearest $1000 figure. The answer to the defendant's argument is determined by an analysis of the language of paragraph 34. This paragraph is concerned with a "performance bond." Such a bond was required to insure performance by the defendant. The defendant performed its obligations under the contract to operate the restaurants. The plaintiff brought the present action to recover rents due, not to "seize the performance bond as liquidated damages." The amount of $200,000, "25% of the guaranteed minimum annual rental adjusted to the nearest $1000 figure," has meaning only in conjunction with the performance bond. It has no relationship whatever to the present suit for rents owed.

There is no error.

In this opinion KING, C. J., SHEA and SHAPIRO, Js., concurred.

MURPHY, J. (dissenting). It seems rather farcical to me for this court to put the stamp of approval on the inequitable conduct of the state in this case when it would have condemned such action had the state not been the offender. When the invitation to bid was sent out on July 29, 1955, the highway commissioner had in his possession, and was contemplating action in accordance with, two special reports which he had requested from the traffic engineers who were advising him. The information in these reports was not forwarded to the bidders although, after the bids were received and the contract with the defendant executed, the commissioner proceeded to put into effect the recommendations of the engineers.

The 1954 report which was sent to the bidders was based on a fifteen-cent toll rate. The May, 1955, report recommended increasing the toll rate west of New Haven to twenty-five cents, although this change would decrease the traffic through the toll stations by 23 percent. In other words, the revenue through tolls would be greater, but the number of travelers on the turnpike who would be potential customers at the restaurants would fall off by almost one-quarter. The May, 1955, report also discussed the issuance of low-rate commuter tickets which would increase the number of vehicles passing through the toll stations. The likelihood that these short-haul customers would work up an appetite on their trips would be slim. But the bidders were not advised that, as a result of the reports, the commissioner was given statutory authority at the special session of the legislature in June, 1955, to grant

reduced tolls to commuter traffic. Public Acts, Spec. Sess., June, 1955, No. 52, § 4; Cum. Sup., 1955, § 1212d (General Statutes § 13-162 [b]). That act became effective on June 29, 1955, but was not published until after August 16, 1955. Yet the defendant is chargeable with knowledge of this change in the law although the invitation to bid made no mention of commuter traffic and the bids had to be in on August 10, 1955.

The estimate of 44,940,000 toll-station vehicle trips in 1958 was set out in the contract as the basic standard measure to be used in computing the defendant's liability under the contract. Twenty-three percent of that figure is 10,336,200, which the trial court should have added to the 44,940,000 to compensate for the reduction in toll traffic due to the increase in toll fare. The result would be 55,276,200. The trial court should have reformed the contract by substituting 55,276,200 as the basic standard measure. In any fiscal year in which the number of toll-station vehicle trips, exclusive of commuter ticket traffic, exceeded 55,276,200, the minimum annual guaranteed rental would be due. This disposition would be equitable and negate the underlying philosophy of the state's position that "[t]he King can do no wrong."