## Frederick McCullough *v.* The Crown Sheet Metal and Roofing Company

SUPERIOR COURT    NEW HAVEN COUNTY    FILE No. 99407
AT NEW HAVEN

Memorandum filed December 2, 1968

*Herman M. Levy* and *Garvey, Colleran & Weiner,* both of New Haven, for the plaintiff.

*Tyler, Cooper, Grant, Bowerman & Keefe,* of New Haven, for the defendant.

GRILLO, J.  Fundamentally this action is predicated on the contention of the plaintiff that in October, 1961, he terminated his employment with his then employer (Koppers Company, Inc.) and entered the employ of the defendant upon an offer of a lifetime employment contract by the defendant and, further, that in April, 1962, the defendant, in violation thereof, discharged the plaintiff.  Although shortly after this discharge he returned to his former employment with Koppers Company, the plaintiff avers that because he had previously left that employment his pension rights with Koppers Company have been considerably reduced, and he seeks damages for such diminution of pension benefits.  The parties have agreed that these proceedings should determine liability alone and that the ascertainment of damages should be deferred pending the outcome of the instant litigation.

The court views the following facts as crystal clear:  In the early months of 1961 the business of the defendant—the roofing business—had been declining.  The plaintiff had become disenchanted with his employment at Koppers Company because of increased areas of responsibility.  His sales ability and knowledge of technical aspects of the roofing business were known to the president of the defendant corporation, Louis Sala, its majority stockholder.  The corporation needed an impetus to bolster its sales.  Informal negotiations were begun in the spring of 1961 between Sala and the plaintiff, and the former, with the acquiescence of the defendant, employed the plaintiff in October, 1961, as a sales engineer to act principally as a salesman, an

attractive increase in salary serving as an added inducement to the plaintiff. The defendant's expectation that the plaintiff would "bring in" new business was not realized, and he was discharged in April, 1962, by the corporation.

The plaintiff contends that in addition to receiving a promise of a lifetime employment, he was to learn the managerial end of the business, and via a stock purchase agreement and annual bonus benefits, payable in shares of stock of the defendant corporation, he was assured that ultimately he was to become owner of all the outstanding stock of the defendant and to "take over" the corporation, to use the plaintiff's phrase. Parenthetically, it might be noted that the plaintiff even at the time of trial did not know the number of outstanding and issued shares of the corporation's stock.

Since, obviously, the only consideration for the alleged promise of lifetime employment was the implied promise of the plaintiff to work for that period, the claimed employment contract was extraordinary, to say the least. *Lee* v. *Jenkins Bros.,* 268 F.2d 357, 367. Nothing appears in the recorded minutes of the meetings of the defendant—the minutes, incidentally, appear to have been meticulously kept—which sustains the existence of such a contract. The plaintiff would have the court accept the proposition that the defendant would employ an "outsider," untried, untested, and concededly unskilled in corporate management, and give him, in addition to a lifetime contract, an opportunity to own the company—all to the exclusion of its own "seasoned" and apparently loyal corporate officers (intermittently, they had made loans to the corporation), one of whom was a majority stockholder. It is obvious that under the stock acquiring plan referred to above and claimed by the plain-

tiff to have been promulgated with the promise that he would "own" the company, the plaintiff, in view of the number and market or book value of the issued shares of stock of the company, would have to live far beyond his normal allotted years to realize ownership. Pursuing the claim of the plaintiff to its logical conclusion, the defendant's corporate officers (owners of practically all issued shares of stock), desirous of strengthening their company, employed the plaintiff with the ultimate purpose of increasing the corporation's profits and then, having realized that ambition, were to relinquish ownership of the business to the plaintiff—an anomaly, an incongruity.

The plaintiff would also have the court believe that the insurance resolution, relating to payment of $400 monthly to his wife for a three-year period subsequent to his death if just prior thereto he was then still employed by the defendant, was considered by him to be a lifetime contract.

To accept the contentions advanced by the plaintiff would strain the credulity of the court. The hiring was indefinite as to time and terminable by either party at will. *Fisher* v. *Jackson,* 142 Conn. 734, 737. Undoubtedly Sala resorted to hyperbole—such as his assurance that the plaintiff would have "no regrets"—but this was merely an expression of rosy vaticination rather than a promise or action justifying the invoking of the doctrine of equitable estoppel against the defendant corporation.

Even if we assume that Sala's declarations and conduct are binding on the defendant, certainly they do not indicate intended deception or gross negligence. Furthermore, a simple perusal of the company's minutes by the plaintiff would have given him knowledge as to the validity of his belief—if so he did believe—that the corporation had given him

a contract for life and he could eventually acquire a controlling interest in the corporation. *State* v. *American News Co.*, 152 Conn. 101, 113. Even if we assume that Sala did make the statements reasonably indicating to the plaintiff that the offer was for a lifetime contract, justifying and resulting in a change of his position with his then employer, it was still incumbent upon the plaintiff to ascertain his employment status insofar as the defendant corporation was concerned. "It is fundamental that a person who claims an estoppel must show that he has exercised due diligence to know the truth, and that he not only did not know the true state of things but also lacked any reasonably available means of acquiring knowledge." *Spear-Newman, Inc.* v. *Modern Floors Corporation*, 149 Conn. 88, 91. The record reveals a complete lack of diligence on the part of the plaintiff to ascertain whether the defendant corporation subscribed to the proposal which the plaintiff claims Sala made to him. Indeed, the plaintiff was ignorant even of the number of shares required to be purchased by him to gain a controlling interest in the defendant corporation.

The short-lived association of the parties is often a risk attendant upon changing employment. The best laid plans of businessmen often go awry, to paraphrase the Scottish poet.

Judgment may enter for the defendant.